[No. H001787. Sixth Dist. June 24, 1987.]

ROBERT J. MIXON, Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant
and Respondent.

1308

COUNSEL

Louis D. Silver for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Henry Torres, Jr., Deputy Attorneys General, for Defendant and Respondent.

OPINION

BRAUER, J.—Robert Mixon appeals from an order denying his petition for a writ of administrative mandamus seeking to overturn a decision of the

Fair Employment and Housing Commission (the FEHC or the Commission). The Commission had found that Mixon's employer, the Hospital and Institutional Workers' Union, Local 250 (Local 250), had not discriminated against him on the basis of race when it terminated his employment. Mixon's petition challenged this decision on the ground that it was not supported by the Commission's findings. After reviewing this same question on appeal we have concluded that the findings support the decision. We therefore affirm the judgment.[1]

### The Standard of Review

 There has been some confusion throughout these proceedings as to the appropriate standard of review both in the superior court and in this court. Mixon's writ petition was brought under Code of Civil Procedure section 1094.5 which provides three grounds for establishing that an agency has abused its discretion: the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." Only the second of these was at issue.[2] There was no claim that the evidence failed to support the findings; therefore, a review of the administrative record was entirely unnecessary in the trial court and is not called for here.

The trial judge misconceived the scope of his duties when he observed: "The question is and the only question is whether or not the Commission's decision is supported by substantial evidence and independent review of the record will support that decision." While the court's feeling was that petitioner had been "ill used," and "treated very poorly," the judge nonetheless indicated his intended decision to deny the petition, saying this: "... I think

---

[1] Since the trial court's order denying the writ petition represented a final judicial determination we treat it as an appealable judgment, despite the fact that no formal judgment was entered. (Cal. Civil Appellate Practice 2d (Cont.Ed.Bar 1985) Appealable Judgments and Orders, § 2.11, p. 29.)

[2] One additional ground stated in the petition, that the Commission was without power to make findings regarding the credibility of certain testimony, was not addressed in appellant's brief. Since it was, however, raised at oral argument before this court we will comment briefly here. Mixon takes the position that the Commission must accept the factual findings of the administrative law judge who originally heard the matter. We find no merit in this argument. Under Government Code section 11517, subdivision (c) the Commission may refuse to adopt the administrative law judge's proposed decision and may then decide the case itself "upon the record, including the transcript, with or without taking additional evidence ...." It follows that once the administrative law judge's proposed decision is rejected, "it serves no identifiable function in the administrative adjudication process" (*Compton* v. *Board of Trustees* (1975) 49 Cal.App.3d 150, 158 [122 Cal.Rptr. 493]), and is in no way binding on the Commission. Mixon's cases (for example, *Merrill Farms* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 176 [169 Cal.Rptr. 774] stand only for the general proposition that the credibility of a witness is a matter solely within the province of the finder of fact, and are inapposite here.

I am legally bound to affirm the—the findings of the Commission and to deny the petition for a writ." There followed a written order denying the writ petition on the basis that "the evidence in the administrative record supports the findings of fact and the determination of issues."

Taking his cue from these pronouncements, Mixon argues on appeal that the trial court erred in applying the substantial evidence test rather than the independent judgment test, and that in either case we must reverse because the court's decision is not supported by substantial evidence. The FEHC contends that the issue before the trial court presented only legal questions, since Mixon had not challenged the Commission's factual findings. The FEHC is correct. It is also correct in its assertion that Mixon cannot now argue the substantiality of the evidence for the first time on appeal.[3]

■ The posture of a case in which the sufficiency of the evidence is not disputed is identical to that where the facts before the administrative agency are uncontradicted. In such a case the only issue concerns the conclusions to be drawn from the pertinent facts; the trial court's determination is therefore a question of law. (*Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 545 [122 Cal.Rptr. 315].) ■ On appeal our review is not circumscribed by the substantial evidence rule, but amounts to an inquiry of law. In essence we treat the appeal as a renewed petition for a writ of mandate. (*Swaby* v. *Unemployment Ins. Appeals Bd.* (1978) 85 Cal.App.3d 264, 269 [149 Cal.Rptr. 336], disapproved on other grounds in *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101 [172 Cal.Rptr. 194, 624 P.2d 244].)

With this in mind, we proceed to the facts, taking our summary directly, and in part verbatim, from the findings of the Commission.

### The Facts

In the summer of 1978 Mixon, a Black man, submitted an employment application to the San Francisco office of Local 250. In January of 1979 he was informed that there was a position for a business representative available in the Stockton office. Later that month Mixon met with Joan Allen Bryant, the regional director for the Stockton area. During this meeting Bryant asked him if he could relocate to Stockton. Mixon replied that he had just bought a house in San Jose, he was installing a swimming pool, and

---

[3] We note that our Supreme Court in the case of *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261] has held that a party may advance a new theory on appeal when the issue posed is not a factual one and involves important questions of public policy. Our case does not fall within this exception.

his wife was a school teacher in San Jose, "but that there would be no problem relocating." Bryant told him that "if the commute from San Jose to Stockton interfered with his work, he would be required to relocate later."

Mixon began work for Local 250 as a business representative on February 12, 1979, servicing the Stockton, Manteca, Modesto and Tracy areas.

Bill Dougherty was the controller of Local 250. Since becoming controller in March of 1978 he had made an effort to reduce union expenses by scrutinizing the expense accounts of the business representatives. Dougherty had also instituted a policy of focusing on the finances of each of the union's four regions rather than the northern district as a whole. He was particularly concerned about Stockton because dues in that office were insufficient to cover operating expenses.

Mixon called Dougherty approximately a month after he started to work, to find out why he was not fully reimbursed for meal expenses. Dougherty informed him that the union had certain limits on meal expenses. In the course of the conversation Dougherty "asked [Mixon] when he was going to relocate because he [Dougherty] was concerned about the high commuting expenses. [Mixon] responded that his employment was not contingent upon his relocation to the Stockton area."

Shortly after this conversation Dougherty spoke with Timothy Twomey, the secretary-treasurer of Local 250, about Mixon's failure to relocate. Twomey then called Bryant, who as regional director was Mixon's immediate supervisor, to inquire when Mixon planned to relocate. "Bryant told Twomey that [Mixon's] wife was teaching school, but that [he] would be relocating during the summer ...."

Over the next few months Dougherty spoke with Mixon several times, complaining that his gas and mileage expenses were too high and asking when he was going to move. Mixon responded again that relocating had not been made a condition of his employment. He also asked Dougherty why he should move when other representatives who were not Black were allowed to commute. Dougherty told Mixon that was none of his business. Finally, Mixon told Dougherty "that Dougherty should talk to his supervisor, Joan Bryant, since he was not hired upon condition of relocation." Thereafter both Dougherty and Twomey channeled their communications to Mixon through Bryant.

Bryant's testimony in this regard was summarized by the Commission as follows: "Bryant testified that on at least three occasions she was told by the

Secretary-Treasurer and the Controller that complainant would have to relocate to the Stockton area because of the expense to the local. Bryant later contradicted herself and testified that the Controller only asked why complainant had not relocated. Later in her testimony, Bryant stated that she once received a call from the Controller and that she told complainant that she had been told to tell him to relocate. Bryant further testified that she would tell complainant when she had been called by the Controller or the Treasurer and tell him that they were giving her a "bad time' about complainant's failure to relocate. In response, complainant would ask why other business representatives were allowed to commute."

The distance between San Jose and Stockton is approximately 77 miles. Mixon lived in north San Jose. He testified that his driving distance was 57 miles each way and that it took him approximately an hour and 15 minutes.

Although Mixon's average monthly auto expenses of $245.16 were the highest of Local 250's 32 business representatives, other non-Black representatives had expenses nearly as high. Representatives Jones and Carnejo who commuted from San Jose to Oakland had expenses of $232 and $185 respectively. Dougherty testified that he had taken no action to cut expenses of Jones or Carnejo because they had been commuting before he became controller. Representative Bratt's expenses were $228. There was no evidence as to how long Bratt had been commuting or the length of his commute.

In addition to these three, the findings listed five other non-Blacks, including Dougherty himself, who commuted significant distances. With the exception of Jones, Carnejo and Dougherty, there was no evidence as to how long any of the eight had been commuting, or the exact length of their commutes. None of these people was asked to relocate. Mixon was the only Black who commuted a significant distance from home to his job assignment.

Several White representatives who faced significant commutes had been given the option to relocate or resign. These included Zimmerman, Mead, and Crowley. Zimmerman chose to resign rather than move when he was transferred from Fresno to Stockton. Mead resigned rather than move from San Jose to Santa Rosa. Crowley relocated when transferred from Stockton to Fresno. There was no evidence as to how long these three had been employed by Local 250. Bryant was the regional director who had informed both Zimmerman and Crowley of the option to move or quit. In addition Bryant was instrumental in arranging for Charlene Masters to replace Mixon. Masters was transferred from the San Jose office to the Stockton office

and was told by Bryant that she would have to relocate as a condition of the job.

Although Mixon was told by Bryant that Twomey and Dougherty "wanted him to relocate, he was never directly ordered to relocate, nor was he advised that he would be terminated if he did not relocate."

Mixon had been told at the time of his employment interview that his probationary period would be six months. After he had been working for Local 250 for approximately six months, Bryant sent a letter to Twomey informing him that although Mixon needed some assistance in the area of collective bargaining since he was new to this aspect of the job, otherwise "he was doing the job quite well."

In the period following this letter, Bryant apparently complained to others in the union that "she was having difficulty with [Mixon]," that he would not take orders, and that she was "after him" to move but he couldn't find a house in Stockton. She told Twomey in October of 1979 that Mixon "still refused to move" and that he "kept coming up with excuses after excuses." She also complained to her secretary during this time that Mixon "was not available to the membership, that there was no organizing going on in the area, and that he was refusing to follow orders." Gerald Crowley, regional director for Local 250 in the Fresno area, testified that "Bryant told him on several occasions that there were problems with complainant in terms of following directions and not relocating."

Some time in the summer of 1979, Bryant had a conversation with Bob Gerstenlauer, regional director of the Santa Clara Valley area wherein she said that Mixon "simply refused to relocate, that he would not follow her instructions, that [he] did not get along with the employers or the membership, and that she felt something had to be done." It was from Gerstenlauer's region that Bryant recruited Masters, in November or December of 1979, to take Mixon's place.

Twomey called Bryant approximately four to six weeks before Mixon's termination in December of 1979 to discuss his continued failure to relocate. During this conversation "Bryant told Twomey that she had talked to complainant and communicated to him what she had been told by the Secretary-Treasurer and the Controller about his relocating to Stockton."

Twomey testified that it was Bryant who finally decided to terminate Mixon because "she had had enough." Bryant testified that Twomey called her on December 15 and "told her to fire [Mixon] because of his failure to relocate and the resulting expense to the union."

On December 17 Bryant told Mixon that he was terminated effective December 28 "because of his failure to relocate and unsatisfactory work performance." A memo of the same date recited, in addition to the failure to relocate, the following reasons for the termination: "(b) His interaction with the membership and management had caused him to be ineffective in carrying out his duties; and (c) It was apparent that complainant had not grasped the job duties of business representative to meet the standards as set forth by the executive officer."

In explanation of this memo, "Bryant testified that when told to terminate [Mixon] because of his failure to relocate, she did not feel that failure to relocate was a sufficient ground for [his] termination because there were non-black business representatives who were commuting but were neither terminated nor ordered to relocate. There was no evidence that Bryant communicated these feelings to her superiors. Bryant added the two reasons relating to work performance cited in [Mixon's] written termination notice on her own initiative."

Prior to his termination Mixon had never been advised that he had an "interaction" problem. Bryant admitted that Mixon "was performing his job satisfactorily and said she did not consider his job performance to be grounds for his termination."

On December 20, 1979, Mixon met with Dougherty and Bryant to discuss his termination. Dougherty spoke to Mixon again regarding his failure to relocate and the cost involved in his commute. Nothing was resolved.

In January of 1980, after his termination, Mixon met with Twomey, complaining that he had been terminated without any notice that he had to relocate. During this conversation Twomey informed Mixon for the first time that his probation period had been extended. Mixon had received no notice of this extension, whereas two White representative trainees in the San Jose office were given written notice of similar extensions, including the reasons therefor.

On March 17, 1980, Mixon made a written request for arbitration regarding his discharge, as is provided for in the constitution of Local 250. He was informed by letter from Twomey that "he could not avail himself of the arbitration procedure because he was still a probationary employee at the time of his termination." In fact the union's constitution does not distinguish between a probationary and permanent employee's right to arbitration. Twomey's letter advised Mixon that he could request arbitration from the executive board by appearance on April 30, 1980.

On April 14, 1980, Mixon made a written request to review his personnel file in order to prepare for the board meeting. This request was denied without explanation.

Mixon appeared before the board on April 30, 1980. The Board denied his request for arbitration. In response to Mixon's request for a written explanation, Twomey sent him a letter stating that his request for arbitration had been denied but stating no reasons for the denial.

On May 12, 1980, Mixon filed a verified complaint with the Department of Fair Employment and Housing (the DFEH or the Department) alleging that his discharge constituted discrimination in violation of the California Fair Employment and Housing Act. The Department investigated the matter and filed a formal accusation on July 9, 1982. The matter was heard before George Coan, administrative law judge. Judge Coan issued a proposed decision wherein he determined that Local 250 had engaged in an unlawful employment practice by discharging an employee because of his race, and ordered that Mixon be reinstated with back pay. Judge Coan awarded additional compensatory damages "for emotional distress, shame and humiliation," and found that the union's "deliberate, egregious, and inexcusable conduct" warranted punitive damages.

The Commission determined not to adopt the proposed decision of the administrative law judge but rather to decide the case itself upon the record and supplemental briefing.[4] Its decision overturning Judge Coan was issued on December 7, 1984. Two members of the Commission's five member panel dissented and wrote separately, finding that the facts demonstrated unlawful discrimination. Mixon's unsuccessful petition to the superior court followed.

*Discussion*

Under both state and federal antidiscrimination legislation,[5] it is unlawful for an employer to discharge a person on the basis of race, or otherwise "discrimate against the person in compensation or in terms, conditions or privileges of employment."[6] While the California act and title VII differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute.

---

[4] See footnote 2, *ante.*

[5] Here we refer to the California Fair Employment and Housing Act, Government Code section 12900 et seq, and title VII of the Federal Civil Rights Act, 42 United States Code section 2000e et seq.

[6] Government Code section 12940, subdivision (a). Section 2000e-2 of the Civil Rights Act contains the same language.

(*Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365]; *County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499 [200 Cal.Rptr. 381].) Neither of the parties here disputes the applicability of the legal analysis developed by the federal cases. In addition we note that the precedential decisions of the FEHC (compiled and published by Cal. Continuing Education of the Bar) rely upon these cases.

In *Teamsters* v. *United States* (1977) 431 U.S. 324 [52 L.Ed.2d 396, 97 S.Ct. 1843], the Supreme Court stated that conceptually the theory of " '[d]isparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." (*Id.*, at pp. 335-336, fn. 15 [52 L.Ed.2d at p. 415].)

■ To prevail under the disparate treatment theory, an employee must show that the employer harbored a discriminatory intent. In most cases, the complainant will be unable to produce direct evidence of the employer's intent. Consequently certain rules regarding the allocation of burdens and order of presentation of proof have developed in order to achieve a fair determination of "the elusive factual question of intentional discrimination." (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 101 S.Ct. 1089].) A three-part analysis was mandated by the Supreme Court in the case of *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]: (1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive.

■ The *McDonnell Douglas* model for a prima facie case is as follows: The complainant must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*McDonnell Douglas* v. *Green, supra,* 411 U.S. 792, 802 [36 L.Ed.2d 668, 677].) As this test focused only on discriminatory hiring practices, the Supreme Court acknowledged in a footnote that the precise elements of a prima facie case would vary according to differing theories of discrimination and different factual situations. (*Id.*, at p. 802, fn. 13 [36 L.Ed.2d at pp. 677-678].)

The *McDonnell Douglas* prima facie case has since been adapted to and applied in a variety of contexts.[7] Where discharge from employment is the challenged action, the complainant must make an initial showing that he was discharged from a position for which he was qualified "under circumstances which give rise to an inference of unlawful discrimination." (*Texas Dept. of Comm. Affairs* v. *Burdine, supra*, 450 U.S. 248.) The circumstances generally fall into two categories: either he was replaced by a nonminority member no more qualified than he (see, e.g., *Chaline* v. *KCOH, Inc.* (5th Cir. 1982) 693 F.2d 477; *Coleman* v. *Braniff Airways, Inc.* (5th Cir. 1982) 664 F.2d 1282), or he was fired when nonminority co-workers similarly situated were not fired. (*McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574]; *E.E.O.C.* v. *Brown & Root, Inc.*, (5th Cir. 1982) 688 F.2d 338.) ■ The prima facie case for discriminatory discharge can therefore be stated thusly: (1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class.

■ Establishment of the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248, 254, fn. 7 [67 L.Ed.2d 207, 216].) The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (*McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. 792.) "The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Citation.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248, 254 [67 L.Ed.2d 207, 216].)

■ Finally, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.... [Plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." (*Id.* at pp. 255-256 [67 L.Ed.2d at pp. 216-217].) "[He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indi-

---

[7]For example, *E.E.O.C.* v. *West Bros. Dept. Store,* (5th Cir. 1986) 805 F.2d 1171 (failure to promote); *Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248 (failure to promote and termination of employment); *Uviedo* v. *Steve's Sash & Door Co.* (5th Cir. 1984) 738 F.2d 1425 (wage disparity); *Lynn* v. *Regents of the University of California* (9th Cir. 1981) 656 F.2d 1337 (denial of tenure); *Grant* v. *Bethlehem Steel Corp.* (2d. Cir. 1980) 622 F.2d 43 (retaliatory actions).

rectly by showing that the employer's proffered explanation is unworthy of credence." (*Id.,* p 256 [67 L.Ed.2d at p. 217].) "This burden now merges with [plaintiff's] ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." (*Id.,* at p. 256 [67 L.Ed.2d at p. 217].) At this stage, the *McDonnell/Burdine* presumption "drops from the case" and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff. (*U.S. Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 715 [75 L. Ed.2d 403, 103 S.Ct. 1478].) In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's.

■ While a complainant need not prove that racial animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision.

■ With these principles in mind, we now turn to the findings and the decision of the Commission. Initially we note that the Commission's decision does not reveal that it engaged in the three-part analysis required by the Supreme Court. There is no reference to a prima facie showing and a resultant shifting of burdens. The Commission opened its discussion of issues by saying this: "[d]iscrimination on the basis of race is established if we determine that a preponderance of all the evidence demonstrates that a causal connection exists between complainant's race and his termination." Recognizing that the complainant bears the burden of persuasion, the Commission concluded, after lengthy analysis of the facts, that Mixon had not carried this burden: "we are persuaded that it was complainant's failure to relocate, not his race, that was the cause for his termination."

■ Thus it appears that the Commission addressed only the ultimate issue of discrimination, thereby "collapsing" the three-step analysis into one step. (See, e.g., *Sumner* v. *San Diego Urban League Inc.,* (9th Cir. 1982) 681 F.2d 1140.) But we do not find this to be a fatal defect. In the *Sumner* case the reviewing court was presented with a single conclusory finding as the sole explanation of the lower court's decision. The circuit court held that the "findings" of the district court were "insufficient to enable us to understand the basis for its decision under [*McDonnell* and *Burdine*] . . . ." (*Id.* at p. 1142.) In contrast, the Commission's decision here included 67 detailed factual findings followed by an exhaustive discussion. Courts have recognized that the order of proof of every discriminatory treatment case need not be rigidly compartmentalized. (*U. S. Postal Service Bd. of Governors* v. *Aikens, supra,* 460 U.S. 711; *Williams* v. *Southwestern Bell Telephone Co.* (5th Cir. 1983) 718 F.2d 715.) The Commission's deci-

sion here presents a clear and explicit account of its findings and legal conclusions. Under the circumstances, the lack of reference to *McDonnell Douglas* standards does not adversely affect our ability to review the case.[8]

 It is evident that Mixon has demonstrated a prima facie case of discrimination. The findings establish that he is Black, his work performance was satisfactory, and he was fired whereas White business representatives who commuted were not fired. Moreover, he was replaced by a White worker with no more experience than he had.

In response, the union asserted Mixon was fired out of business necessity: his expenses were the highest in the union, he served a union office which could ill afford to absorb the cost, and he was unwilling to relocate to reduce expenses. Since this is a legitimate nondiscriminatory reason for termination, the union has satisfied its burden of production and the inquiry rises to the third level.

At this stage, as *Burdine* has shown us, the complainant must prove by a preponderance of the evidence that a discriminatory intent was behind the decision to terminate.

The findings reveal no direct evidence of racial animus on the part of any union official. Moreover, Bryant herself was Black, as was one other of the four regional directors of Local 250. One of the vice presidents of Local 250 was also Black.

Mixon must then prove his case indirectly, by showing that the employer's reasons for terminating him, namely high expenses and failure to relocate, are "unworthy of credence." In this regard he argued 1) that the union hired him with the knowledge that he was not willing to relocate, and 2) that he was treated differently from White representatives who commuted similar distances and had high expenses.

In support of the first point, Mixon's employment application shows that in answer to the question "If necessary, are you willing to relocate?," he stated "No." The application, however, is dated April 23, 1979, more than two months after Mixon had been on the job. Mixon's original application, and a second one given to Bryant at the initial interview, had apparently both been lost. The findings establish only that before he was hired he was told that "he would be required to relocate" to Stockton "if the commute interfered with his work," and at that time he represented this "would not

---

[8] The extensive findings made in this case amount to a comprehensive evidentiary summary. As a consequence, although the substantiality of the evidence is not at issue here, our discussion will at times resemble an evidentiary review.

be a problem." These findings support an understanding by both sides that a move might be required at a later date.

As to the second point, Mixon produced evidence of eight White business representatives who were allowed to commute significant distances without being obliged to relocate. Of these, five served the Oakland office of Local 250, two worked in San Francisco, and one commuted from Stockton to Sacramento. None serviced the Stockton area. The controller testified that dues from the Stockton members did not cover operating costs at that office. Whereas other offices could afford to pay the expenses of their commuting representatives, the Stockton office apparently could not. Moreover, Dougherty testified that the policy of cracking down on commuting expenses was instituted by him after his installation as controller and that its application had not been extended to those who had been commuting before his time. These facts distinguish Mixon's situation from that of the others, supporting a conclusion that he was treated differently for the legitimate reasons offered by his employer.

Somewhat more troublesome is the finding that White business representatives whose travel expenses required that they relocate were given a specific option either to move or quit, whereas Mixon was not given such an option. Again, the central question is whether the persons sought to be compared are in fact in a comparable factual setting. The three cases in which employees were given an option involved employment decisions to transfer a representative from one office to a distant office, such that a lengthy commute presented itself. In one case the transferred employee would have faced a commute from San Jose to Santa Rosa. The other two would have involved commutes from Fresno to Stockton and vice versa. In each instance the option to relocate or resign was apparently coincidental with the decision to transfer. This was so as well in the case of Masters, who was transferred to Stockton from San Jose to replace Mixon. On the other hand, Mixon's circumstances were somewhat different since he was a new employee who had been hired with the proviso that he would be asked to move if the commute interfered with his work.

More importantly, it was not proven, as the formal accusation in this case had alleged, that Mixon was fired without being advised that he had to relocate to Stockton. The findings make clear that Mixon had ample notice that management wanted him to move. Dougherty expressed his concern directly to Mixon. On numerous occasions Bryant communicated to Mixon that Twomey and Dougherty were upset about his failure to move. On one occasion Bryant told Mixon that Dougherty had told her to tell him to relocate. In addition, Bryant expressed to others in the union her mounting

frustration that Mixon would not follow her orders and refused to relocate despite the fact that she was "after him" to move.

Thus while the union cannot show that Mixon was given the express option to move or quit, the findings establish the following: he knew from the outset he might be required to move; he was on notice from as early as the first month after starting work that his expenses were considered to be too high; management repeatedly told his supervisor throughout the year that he must move; and his supervisor communicated these demands to him. In our view such circumstances would leave no doubt in the mind of a reasonable person that his job was in jeopardy unless he made plans to relocate. In any event these findings do not reasonably support a conclusion that the union had an impermissible motive in firing Mixon.

Finally, Mixon argues that his treatment following termination demon-. strates a continued pattern of discrimination. He was not informed that his probationary status had been extended, he was denied access to his personnel file, he was refused arbitration in violation of the union's constitution, and he was given no written explanation of this refusal. As to all but the first incident, there were no findings that Mixon was treated differently from other employees. We do not by any means endorse the union's actions; however, without evidence tending to establish a nexus to prohibited discrimination, these incidents by themselves are not actionable under the California statute.

In regard to the first point, the Commission found that two White employees were given written notices that their probationary periods had been extended, whereas Mixon received no such notice. The findings note that there was no evidence as to the names or circumstances of the two individuals who received such notices, except that they worked in the San Jose office. There was no further proof that written notice of this kind was standard policy at the union. On the other hand the union did not furnish an explanation why Mixon was not notified in writing, and others were.

It is important that this incidence of disparate treatment was not placed in issue by the allegations in either Mixon's complaint or the accusation filed by the Department; therefore the union's failure to produce specific rebuttal evidence does not compel a finding in favor of Mixon. The action at issue here was Mixon's discharge. The fact that he did not receive notice of his probationary status and two White employees did is evidence properly considered and weighed in determining the ultimate question of discrimination *vel non* in regard to the discharge. On balance, the Commission did not find it to be compelling and the responsibility to weigh evidence was the Commission's. We are not empowered to reweigh it.

In summary we are satisfied the findings of the Commission support its conclusion that Mixon's discharge was not motivated by racial discrimination.

The judgment denying the writ of mandamus is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied July 15, 1987.