Opinion
 

 LILLIE, P. J.
 

 The Los Angeles County District Attorney’s Office (D.A.) appeals the trial court’s judgment denying a peremptory writ of mandamus. The D.A. had challenged the Los Angeles County Civil Service Commission’s order raising a promotion examination score of Deputy District Attorney Larry D. Walls, an African-American, and finding the D.A. racially discriminated against Walls. In a separate appeal consolidated with the D.A.’s appeal, Walls contests the trial court’s order denying him an award of attorney’s fees under the “private attorney general” doctrine set forth in Code of Civil Procedure section 1021.5.
 

 Factual and Procedural Background
 

 Since 1983, Walls was a deputy district attorney. In 1984, he was promoted from a grade I to a grade II attorney.
 

 Walls applied for a grade III position in 1986. The grade III position, as with all promotions, required taking an examination as a prerequisite. Walls received an 86 out of a 100 maximum score on his appraisal of promotability (AP). The AP written evaluation stated, “Mr. Walls does not volunteer for extra work. He willingly does what he is asked to do but does not pick up things without being asked.” The evaluation also stated, “although he is not necessarily a legal scholar, he has obtained outstanding jury results because of his confidence and ability to communicate with jurors.” Feeling these comments were racial, Walls appealed to then District Attorney Ira Reiner. The statements were removed, but Walls’s score remained. Walls then appealed the score to the civil service commission. Prior to the hearing on
 
 *191
 
 the matter, Walls and the D.A. reached a settlement whereby the D.A. raised Walls’s AP score to a 91. Walls was then promoted to the grade III status effective April 1988.
 

 On February 1, 1988, Walls was transferred to the D.A.’s Hardcore Gang Prosecution Unit in Compton. This unit, comprised of about 40 attorneys county wide and about 13 or 14 in Compton, required special training due to the difficulty of the cases. Generally, the immediate supervisor, referred to as the deputy-in-charge, would make the case assignments.
 

 In early 1989, the deputy-in-charge position in Walls’s unit became open. Walls was interested in the position but was not selected. Instead, grade III attorney John Allen was appointed. While Allen was Walls’s immediate supervisor, he complained to Genelin about Walls only wanting to try certain types of cases.
 

 Once Allen kidded Walls about being transferred to Lancaster. When Allen reassured Walls this was just a joke, Walls replied, “Oh good, because if anyone tried to take me out of Compton Hardcore, I’ll sue and charge racial discrimination.”
 

 Allen subsequently was promoted to become assistant head deputy of the Hardcore Gang Prosecution Unit. Grade III attorney Joseph Markus filled the deputy-in-charge position in June 1989. This was Markus’s first supervisory job with the D.A.
 

 In the fall of 1989, then bureau director for central trials, Deputy District Attorney John Lynch, arranged a meeting with Walls to discuss an investigation of a jailhouse informant Walls used in 1986 to prosecute Carlos Vargas for murder. The informant had accused Walls of paying the informant to testify falsely. Making a pun out of Lynch’s name, Deputy District Attorney Mark Ashen kidded Walls he was going to be lynched. Overhearing the pun, Markus remarked, in a pretend Southern accent, “Yes, the office is going to have a lynching. We’ve got a rope and all they need is a nigger. And Walls, you’re it.”
 
 [1]
 

 Within the next day or two of the “lynching” comments, Markus told Walls he should not have made the comments and would not make such statements anymore.
 

 
 *192
 
 In January 1990, Michael Genelin, head deputy of the county wide Hardcore Gang Prosecution Unit, met with Walls and Markus in response to Walls’s letter to Reiner stating Walls was under stress. Walls wrote the Vargas case caused him stress, but did not indicate he was having problems with Markus. At the urging of the then director of special operations, Russell Murphy, Genelin asked Walls if he wanted to be transferred. Walls said he wanted to remain in the Hardcore Gang Prosecution Unit.
 

 In a probationary performance evaluation dated March 5, 1990, Genelin rated Walls as a superior attorney. Genelin noted Walls carried a particularly demanding caseload, he had good as opposed to exceptional legal reasoning, his oral presentation was one of his strong suits, had a good attitude toward prosecuting defendants, exhibited outstanding initiative, performed well in new situations and was well thought of by his colleagues.
 

 In June 1990 a promotional examination for grade IV deputy district attorney, considered a supervisory position, was announced. Candidates were rated for the period of June 30, 1989, to June 29, 1990. Walls and 130 other attorneys applied. The applicants included Markus and two other attorneys from Walls’s unit, Barbara Turner and African-American Greta Walker. As part of the application process, Walls submitted a self-evaluation, rating himself an A in all six categories.
 

 The applicants’ supervisors conducted an initial appraisal reviewed by the five-member AP committee which met in September 1990. The committee was comprised of committee chair Chief Deputy District Attorney Gregory Thompson, the assistant district attorney, Murphy,
 
 [2]
 
 the director of central operations and the director of branch operations. Since Markus also applied for the grade IV promotion, he was prohibited from evaluating Walls, and Genelin performed the initial evaluation instead. The chief deputy was responsible for ensuring all candidates were measured using the same scale. At the conclusion of the AP committee meetings, a committee member conducted a breakdown by race, ethnicity and gender. To promote minorities, “it is not unusual for some scores to be adjusted upward in order to provide a more favorable balance.”
 

 The appraisers assigned letter grades in the following six factors: (1) professional knowledge and skills, (2) work ethic, (3) professional relations, (4) adaptability, (5) dependability and (6) managerial ability. The letter grades had the respective meanings: A—exceptionally qualified; B—well qualified; C—qualified; D—limited potential; and E—not qualified. Combined, the letter grades translated into a numerical score, with 100 being the highest score, requiring all A’s.
 

 
 *193
 
 When Walls was assigned a case entitled People v. Russell, Markus advised Genelin that Walls did not want this case because of the facts in the case.
 

 In July 1990, before Walls went on vacation on July 30, he notified Markus of the witness problems in Russell. This case was set for trial during Walls’s scheduled vacation. Markus told Walls he did not have time to prepare the case, and for Walls to either get the trial continued or dispose of the case. Walls nevertheless gave the case to Markus, who assigned the case to Walker the Friday before Walls went on vacation. Walker asked Walls if they had witnesses, and he told her they were not subpoenaed. The case was later dismissed because witnesses were not located.
 
 [3]
 
 This was the only case assigned to Walls which was dismissed in 1990.
 
 [4]
 

 On August 1, 1990, Markus wrote a memorandum stating Walls spent the week before his vacation doing nothing, and then on his last day before vacation handed Markus the Russell case.
 

 When Walls returned to work in mid-August 1990, Genelin met with Walls, Allen and Markus. Genelin questioned Walls about Russell.
 

 Thereafter, on August 15, 1990, Walls asked Markus for a copy of the memorandum. Yelling, Markus refused to give Walls a copy. When Walls returned to his office after a court appearance, he found a copy on his chair.
 
 [5]
 
 Walls wrote a reply memorandum addressed to Reiner.
 

 The next day, on August 16, Markus demanded a copy of Walls’s reply memorandum. After getting a copy from the secretary, Markus started screaming at Walls and threatened to get him transferred from “this cushy job that you have.” Markus refused to leave Walls’s office for two hours, and taunted Walls to “settle the matter man to man.”
 
 [6]
 

 Two or three days later, Markus called an office meeting where he apologized to the office for his unprofessional conduct.
 

 Sometime after Walls sent the memorandum to Reiner, Genelin and later Murphy asked Walls if he wanted to be removed from the Compton unit. Walls replied, “no.”
 

 
 *194
 
 Meanwhile, Genelin conducted the initial appraisal of Walls, Walker, Markus, Turner and all the other grade IV applicants in Genelin’s unit. Rather than rely on Markus for input, Genelin spoke with Allen and reviewed the candidates’ performance evaluations. Genelin initially graded Walls an A in factor 1, B in factors 2, 4 and 5, and C in factors 3 and 6, but then the AP committee raised Walls to an A in factor 5 and a B in factor 6.
 

 Murphy received the evaluations Genelin prepared because, as director for special operations, Murphy had overall responsibility for the Hardcore Gang Prosecution Unit. Murphy met with the initial evaluators, including Genelin, to “try to come to some relative assessment of the strengths and weaknesses of various candidates within the Bureau of Special Operations” and “try to determine who were the candidates who had the greatest predictability factor to be effective Grade IV deputies.” He gave little weight to raw statistics of the number of cases tried or won because of cases’ varying difficulty and trial length.
 

 Murphy completed the final written portion of the AP. He rated Walls a B instead of A in the work ethic factor because he believed Walls’s strong reaction against the D.A.’s decision not to oppose Vargas’s motion to vacate his conviction and for a new trial demonstrated Walls did not fully appreciate the ethical demands of trying criminal cases. Feeling Walls was difficult to supervise and not receptive to constructive criticism, Murphy did not change Genelin’s rating of C in the professional relations factor. The committee believed Walls’s confrontation with Markus over his handling of the Russell case showed Walls had poor relations with his supervisors. Nor did Murphy change the B Genelin gave Walls in the adaptability factor, feeling Walls had not exhibited sufficient adaptability to changed circumstances in the Vargas case when he so strongly opposed the D.A.’s decision to permit a new trial for the defendant. Murphy also thought it took far less for Walls to get stressed than any of the other lawyers in the Hardcore Gang Prosecution Unit. Murphy rated Walls an A in professional knowledge and skills based on Walls’s trial skills. Murphy kept the B grade for managerial ability because Murphy believed Walls had no supervisory experience in the office, and “we never saw any of the types of traits that we look for in leaders.” Murphy thought Walls deserved a “qualified” or C rating, but rated him “well qualified” or a B to “give him the benefit of the doubt.”
 

 Genelin gave Markus, Walker and Turner A’s in all categories, as well as nine other applicants in other Hardcore Gang branch offices. Genelin graded Markus highly because he thought it was exceptional for a supervisor to try
 
 *195
 
 seven jury trials in a three-year period and supervise up to thirteen deputies. Markus, Turner, Walker and 29 other attorneys rated 100 and received A’s in all 6 factors, 45 other applicants rated 95, 33 applicants rated 90, 13 applicants rated 85, and Walls and 7 other applicants rated 80.
 

 Of the eight applicants who scored an 80, one was a woman of unidentified race, six were White males and Walls was the only Black man.
 

 On September 23, 1990, Allen, who became the assistant head deputy of the Hardcore Gang Prosecution Unit, informed Walls he was being transferred to a downtown regular trial assignment. Without involving Markus, Genelin made the decision to transfer Walls. Markus did not learn of the transfer beforehand. It was the D.A. management’s policy to transfer attorneys from the Hardcore Gang Prosecution Unit after two to three years of service in the unit.
 

 On October 1, 1990, Walls sent Reiner a letter discussing for the first time Markus’s racial comments made in 1989.
 

 Walls brought two administrative appeals, case No. 90-371 regarding his transfer from the Compton Hardcore Gang Prosecution Unit and case No. 90-386 regarding his AP score.
 

 At the administrative hearing before the civil service commission, Walls testified he had the highest caseload and tried the most cases in comparison to Markus, Turner and Walker. Regarding Russell, Walls testified it was the D.A. witness coordinator’s responsibility to serve subpoenas for trial. After Walls learned his witness coordinator did not subpoena the witnesses, Walls had the secretarial staff prepare subpoenas and give them to an investigator to serve. He testified the Markus memorandum was the first time a supervisor wrote a memorandum about a case being dismissed because of witness problems. Walls also testified the Russell incident “showed some bias” on Markus’s part.
 

 Genelin testified it was the deputies who were responsible for generating subpoenas. He felt Walls should have gotten the subpoenas in the Russell case out “immediately after the last continuance on that case or the last setting on that case . . . .” Genelin felt Walls acted inappropriately in waiting until the week before Russell was set for trial.
 

 Murphy testified the way Walls handled the Russell case precipitated the decision to transfer Walls out of the Hardcore Gang Prosecution Unit. He
 
 *196
 
 thought the dismissal of the case because witnesses were not subpoenaed was inexcusable for a lawyer in a special prosecution unit. “And keep in mind, I had virtually all the special units under my wing, and I could not recall this ever happening where a murder case had been dismissed because subpoenas weren’t issued.” However, even if the Russell incident had not occurred, “Walls probably would have been transferred before the end of the calendar year. ... He might have lasted a few more months before he was transferred, but the decision was that . . . given the effect upon morale in the division over the shouting match that had occurred and some other breakdowns, the time was just right to make the move.”
 

 Genelin testified he decided to transfer Walls out of the Hardcore Gang Prosecution Unit because “Walls was having extreme difficulty in cutting it. I mean by that, he was not doing the job, and because of his inability to handle the caseload that was required, and that other people then had to pick up the slack. That’s not an approach you can have.”
 

 Regarding the AP process, Genelin testified he used the same criteria for Walls as for all the other grade IV applicants within Genelin’s Hardcore Gang division. Genelin explained he graded Walls less than exceptionally well qualified in work ethics because Walls only wanted to try cases he was certain of winning, and Genelin “did not feel that his attitude was responsive to the needs of the department.” Genelin gave Walls a C in professional relations because his relationships with police officers, support staff and management deteriorated. Genelin graded Walls a B in dependability because Genelin could no longer depend on Walls “to do the job. He did not seem to be available to take on an additional caseload. He was not a volunteer.” Genelin rated Walls a C in managerial ability because he thought Walls would have problems in relationships, training, police control and making decisions.
 

 Genelin further testified the earliest time to transfer a deputy from the Hardcore Gang Prosecution Unit “could be a year.” The maximum time for a deputy to remain in the unit was generally three or three and a half years. Genelin made one exception for a deputy who was in trial for one and a half years on one case, and was transferred out right after the case ended. The second exception he made was because he wanted an experienced deputy to open up a new Hardcore Gang branch office. “There’s an overall policy in the office that deputies should not be at singular locations for extended periods of time; they get complacent or slough off. . . . I’m not sure this is really watched too much in the regular trial units, but because special units are high profile, it’s watched in the specialty units.”
 

 
 *197
 
 On January 3, 1992, the hearing officer issued a report on Walls’s two administrative appeals. In the report, the hearing officer blamed Walls for not issuing witness subpoenas in the Russell case before going on vacation. “Not only did this result in the murder case against Russell being dismissed, although it was later reinstituted, Walls compounded his fault by not admitting his error. Rather, in my view, Walls escalated the situation by getting into a loud, public and very unprofessional confrontation with his supervisor over the matter. Markus obviously also acted unprofessionally in this regard but his conduct, however, is not at issue in this case . . . . [U Under these circumstances I believe management was warranted in believing that Walls and Markus could no longer be trusted to work together in the same office and that one of them had to be transferred. Since Walls, in any event, was shortly due for a routine transfer out of Hardcore having already served for two and one-half years, management opted to transfer Walls and not Markus. In my opinion, there was little or no evidence presented at the hearing that the stated reason for the transfer was a pretext to cover up the District Attorney’s discriminatory motivation.” The hearing officer concluded, “the weight of the evidence does not establish discriminatory motivation by the District Attorney in transferring Walls from the Compton Hardcore Unit. The evidence convinces me that management had good sound business reasons for ordering the transfer.”
 

 Regarding Walls’s appeal of his AP score, the hearing officer opined, “I do not believe Markus’ conduct in the Vargas case incident demonstrates that he was Exceptionally Qualified in Professional Relations and deserved the A rating he received in this factor. Nor does Markus’ unprofessional conduct in the Russell case demonstrate that he was also Exceptionally Qualified in Managerial Ability and deserved the A rating in this factor. Even though Walls was clearly at fault in this incident, there is no excuse, in my opinion, for Markus answering Walls
 
 [sic]
 
 unprofessional conduct in kind. A good manager should be able to find other means to deal with subordinates, even those exhibiting the degree of hostility shown by Walls in this incident. However, Walls has not established that the other applicants receiving 100 scores were also undeserving. Accordingly, a pattern of underrating Walls and overrating all others has not been established by the evidence. All we are left with, thus, is the unwarranted disparity in ratings between Walls and Markus. Since I have no authority to lower the ratings received by Markus, the only remedy available to redress this apparent disparity is to adjust Walls’ ratings upward. . . .” The hearing officer recommended raising Walls’s AP score to a 90.
 

 Thereafter, the civil service commission issued findings of fact and a decision sustaining Walls’s appeal of his transfer and appeal of his AP score.
 
 *198
 
 The commission found Walls “an extremely productive Deputy District Attorney who handled [a] large number of important felony cases and secured an above-average number of convictions. His Performance Evaluations have been Outstanding or Very Good and he has received commendations from the District Attorney.” The commission concluded Walls established, by a preponderance of the evidence, his transfer was discriminatory and his AP score of 80 was improper.
 

 In December 1992, the commission issued an order to both transfer Walls back to the Compton Hardcore Gang Prosecution Unit and raise his AP score to 100.
 

 On February 26,1993, the D.A. petitioned for writ of mandate challenging the civil service commission’s decision for Walls.
 

 After the trial court held a hearing on the petition on March 22, 1994, the court denied the petition.
 

 On April 20, 1994, the trial court entered a judgment denying the D.A.’s petition for writ of mandate.
 

 Following the judgment, Walls filed a costs memorandum seeking attorney fees. On June 28, 1994, the trial court issued an order granting the D.A.’s motion to strike Walls’s attorney fees request.
 

 Discussion
 

 The D.A. appeals the trial court’s denial of its petition for writ of mandate challenging the civil service commission’s decision, and Walls appeals the denial of an award of attorney fees. We consider the D.A.’s appeal first, as our decision on the first appeal affects the outcome of the second appeal in that a reversal of the judgment denying the petition would necessarily preclude an attorney fees award to Walls.
 

 Where, as here, the commission ruled for the employee on a discrimination claim and the employer sought a writ of mandate pursuant to Code of Civil Procedure section 1094.5, we review the administrative record as a whole to determine whether substantial evidence supports the Commission’s findings.
 
 (Los Angeles County Dept, of Parks & Recreation
 
 v.
 
 Civil Service Com.
 
 (1992) 8 Cal.App.4th 273, 279-280 [10 Cal.Rptr.2d 150] (Castaneda);
 
 City and County of San Francisco
 
 v.
 
 Fair Employment & Housing Com.
 
 (1987) 191 Cal.App.3d 976, 984 [236 Cal.Rptr. 716].) “Substantial evidence” is not “ ‘synonymous with ‘any’ evidence. It must be reasonable
 
 *199
 
 . . . , credible, and of solid value. . . .’ [Citation.]”
 
 (Kuhn
 
 v.
 
 Department of General Services
 
 (1994) 22 Cal.App.4th 1627,1633 [29 Cal.Rptr.2d 191].) Under this deferential standard, “when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the [trier of fact].”
 
 (Bowers
 
 v.
 
 Bernards
 
 (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925].)
 

 I.
 

 Raising Promotion Evaluation Score Not Supported by Substantial Evidence
 

 The D.A. first contests the commission’s raising Walls’s AP score to 100 as not supported by substantial evidence.
 

 The uncontradicted evidence showed the AP evaluators applied the same criteria to Walls as to the other grade IV applicants, with the exception Genelin performed the initial evaluation of all applicants under Markus’s immediate supervision without involving Markus. This exception promoted fairness because Markus also applied for the grade IV promotion.
 

 If anything, Walls was treated more favorably than he deserved, since the uncontroverted evidence was Murphy graded Walls a B rather than a C in managerial ability to “give him the benefit of the doubt.” Further, Walls did not refute evidence of the AP committee practice of raising some scores in order to promote minorities.
 

 Genelin, Murphy and Thompson corroborated each other’s administrative hearing testimony on the AP process, including the giving of little weight to “raw” statistics of attorneys’ caseloads. Since the grade IV position often required managerial responsibilities, it was appropriate to give minimal consideration to the number of cases a grade IV candidate handled. It was also appropriate to give little weight to raw caseload statistics because such statistics do not take into account the varying complexity and length of individual cases. Moreover, all the testifying evaluators agreed Walls’s reaction to the D.A.’s decision to permit a new trial in the Vargas case showed Walls lacked flexibility and a full appreciation of the ethical demands of trying criminal cases. Even the hearing officer found Walls’s reaction “indicates a strong deficiency” in the work ethics factor.
 
 [7]
 

 Although the hearing officer found Markus did not deserve a perfect AP score, he determined Walls did not establish the other 129 applicants “were
 
 *200
 
 also undeserving.” In an effort to remedy the disparity between Markus’s and Walls’s AP scores, the hearing officer raised Walls’s AP score. Rather than remedy unfairness, this decision was unfair to the other 129 applicants, since it was not based on whether Walls earned a higher score than the AP committee gave him.
 

 Walls maintains since some of his case assignments were at the grade IV level, there was no nexus between his AP score of 80 and his actual performance. This argument lacks merit, as it is uncontroverted the other attorneys in the Compton Hardcore Gang Prosecution Unit also received complex cases. In fact, the very unit was designed to handle difficult cases.
 

 “The decision to promote an employee to a managerial position involves proper subjective and discretionary factors, and it is not the function of the administrative agency or the court to substitute its judgment for the employer’s. [Citations.]”
 
 (Castaneda, supra,
 
 8 Cal.App.4th at p. 283.)
 

 In light of the entire administrative record, we hold there is no substantial evidence to support raising Walls’s AP score.
 

 II.
 

 Racial Discrimination Finding Not Supported by Substantial Evidence
 

 The D.A. next contests the civil service commission’s order finding the D.A. racially discriminated against Walls by transferring him out of the Hardcore Gang Prosecution Unit in Compton.
 

 Where, as here, a minority employee alleges less favorable treatment than non-minorities, federal standards often govern. (Castaneda,
 
 supra,
 
 8 Cal.App.4th at p. 280.) Accordingly, a three-step analysis applies. Under this analysis, the employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If the employee succeeds, the burden of proof shifts to the employer to articulate a legitimate, nondiscriminatory reason for the decision against the employee. If the employer meets this burden, the employee “must then have an opportunity to prove by a
 
 *201
 
 preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.”
 
 (Texas Dept. of Community Affairs
 
 v.
 
 Burdine
 
 (1981) 450 U.S. 248, 253-254 [101 S.Ct. 1089, 1093, 67 L.Ed.2d 207].)
 
 [8]
 

 Walls quotes
 
 Mixon
 
 v.
 
 Fair Employment & Housing Com., supra,
 
 192 Cal.App.3d 1306, 1318, as setting forth the applicable standard for making out a prima facie case: “(1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class.” In quoting
 
 Mixon,
 
 Walls omits the beginning of the sentence stating, “The prima facie case for discriminatory discharge can therefore be stated thusly . . . .”
 
 (Ibid.)
 
 This omission is relevant because Walls was not discharged; he was merely transferred without demotion and given a score on a promotion examination not to his liking.
 

 Walls failed to make a prima facie race discrimination case. The uncontroverted evidence was a transfer from the Hardcore Gang Prosecution Unit after two and a half years was not unusual and in fact complied with management’s policy to transfer attorneys after two to three years in this special unit. Walls offered nothing to contradict the evidence Markus was not involved in the decision to transfer Walls. Moreover, the evidence showed Walls did not apprise management of Markus’s racial comments until after Allen informed Walls he was being reassigned from the Hardcore Gang division.
 

 “While a complainant need not prove that racial animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a ‘causal connection’ between the employee’s protected status and the adverse employment decision.”
 
 (Mixon
 
 v.
 
 Fair Employment & Housing Com., supra,
 
 192 Cal.App.3d at p. 1319.) The record here is devoid of any evidence of a nexus between Markus’s racial comments and Walls’s transfer. Likewise, since Markus was not involved in evaluating Walls’s grade IV application, there is no causal connection between his AP score and Markus’s comments.
 

 Even assuming Walls made a prima facie discrimination case, the D.A., through Genelin and Murphy, articulated a legitimate, nondiscriminatory
 
 *202
 
 reason for transferring Walls—he mishandled the Russell case. Rather than offer evidence showing this reason was a mere pretext for discrimination, Walls merely insinuated racist motives for the transfer. At the administrative hearing, Walls testified with respect to who made the decision to transfer him, “I don’t know who made the decisions. But I think it was motivated by Markus and it was because of his feelings about black people.” Such testimony is mere speculation not supported by any evidence.
 

 On appeal, Walls cites to the part of the administrative record containing a memorandum from Allen to Genelin dated August 24, 1990. The memorandum discussed the August 1990 meeting between Allen, Genelin, Markus and Walls. According to the memorandum, at the meeting, Genelin questioned Walls about whether he was trying to avoid the Russell case. Walls replied “no” and explained he had a prior “run in” with the investigating officers. The memorandum then stated Markus “was supportive about this prior case. At this point, Michael [Genelin] asked Larry [Walls] to look him in the eye while he told Larry that Larry was responsible for seeing that” witnesses be served. Even if, as Walls argues, Genelin’s conduct toward Walls were “a remarkable display of condescension,” the scenario described in the memorandum does not amount to substantial evidence of racial discrimination.
 

 Walls counters the D.A. disparately treated him in criticizing his handling of
 
 Russell
 
 because another attorney, Linda Bushling, received a 100 AP despite her conducting an inappropriate “photo lineup.” In arguing disparate treatment, Walls cites the portion of the record where Allen testified Bush-ling “messed up the investigation” of another case by showing an eyewitness a single photograph of an accused rather than multiple pictures. Walls argues the cited portion of the record shows Bushling was not reprimanded or disciplined for her mishandling the witness interview. However, in response to whether Allen disciplined or recommended disciplining Bushling, Allen replied he told Markus and his successor deputy-in-charge to advise Bush-ling not to conduct a witness interview in the way she did. Allen’s answer could be interpreted as his recommending an informal reprimand for Bush-ling’s mistake. More importantly, Walls cites no evidence showing Bush-ling’s circumstances are even remotely similar to his.
 
 [9]
 

 
 *203
 
 III.
 

 Reversal of Judgment Moots Appeal of Denial of Attorney Fees Under Private Attorney General Doctrine
 

 In appealing the denial of attorney fees, Walls argues he was entitled to a fee award under Code of Civil Procedure section 1021.5. This statute codifies the “private attorney general” doctrine. It gives courts discretion to award attorney’s fees to a party who prevails in an action resulting “in the enforcement of an important right affecting the public interest” if certain elements are met. (Code Civ. Proc., § 1021.5.)
 

 Our overturning the judgment moots Walls’s appeal because he is no longer a prevailing party. Accordingly, we must uphold the trial court’s order denying Walls attorney fees.
 

 Disposition
 

 The judgment is reversed and remanded with directions to issue a writ commanding the civil service commission to both vacate its order and enter a new order denying Walls’s appeal of his AP score and appeal of his transfer. The trial court’s order denying Walls attorney fees is affirmed. Costs on the D.A.’s appeal are awarded to appellant D.A. The parties are to bear their own costs on Walls’s appeal.
 

 Woods, J., and Fruin, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied May 30, 1997, and the petition of real party in interest for review by the Supreme Court was denied July 23, 1997.
 

 [1]
 

 Markus denied making such comments. Instead, he claimed upon overhearing Ashen make a pun out of Lynch’s name, Markus asked, “What is this about lynching a nigger?” Regardless of what exactly was said, the D.A. placed a letter of reprimand in his personnel file.
 

 [2]
 

 He later became assistant district attorney.
 

 [3]
 

 Walker eventually refiled the case, and obtained a murder conviction.
 

 [4]
 

 The prior year another case assigned to Walls was dismissed.
 

 [5]
 

 Murphy testified he put a copy of his memorandum on Walls’s chair.
 

 [6]
 

 Sometime afterward, Murphy reprimanded Markus for losing control and getting into a shouting match with Walls.
 

 [7]
 

 Citing
 
 Mixon
 
 v.
 
 Fair Employment & Housing Com.
 
 (1987) 192 Cal.App.3d 1306, 1310, footnote 2 [237 Cal.Rptr. 884], Walls criticizes the D.A. as improperly citing the hearing
 
 *200
 
 officer’s report and recommendation. However, footnote 2 does not prohibit citation to an initial trier of fact’s findings and recommendations. Rather, the
 
 Mixon
 
 court merely stated an administrative law judge’s proposed decision “is in no way binding” on a state agency. In any event, even if the D.A. improperly referred to the hearing officer’s conclusions, the D.A. did not commit a fatal error, as the D.A. properly relied on the evidence at the administrative hearing.
 

 [8]
 

 Local civil service rules also gave Walls the burden of proof. Los Angeles County Civil Service rule 4.12 (tit. V, appen. 1) provides in pertinent part: “In hearings on discharges, reductions or suspensions in excess of five days, the burden of proof shall be on the appointing power .... In all other types of hearings the burden of proof shall be on the petitioner.”
 

 [9]
 

 In addition, Walls miscites the record as including testimony from Genelin that the Vargas case did not play a role in Walls’s AP. However, the portion of the record Walls cites quotes his attorney’s argument at the administrative hearing. The attorney stated, “I believe there is already testimony from Mr. Genelin that the
 
 Vargas
 
 case played no part in determining Mr. Walls’ appraisal-of-promotability score.” Clearly, counsel’s argument cannot be equated to testimony or any other kind of evidence.
 

 *
 

 Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.