Filed 6/17/24  Quan v. Acrisure of California CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WILLIAM QUAN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ACRISURE OF CALIFORNIA, LLC et al.,<br><br>    Defendants and Respondents. | A166628<br><br>(Sonoma County<br>Super. Ct. No. SCV-264994) |

An insurance firm decided to close the office where appellant William Quan—the only Asian agent at the firm—worked, and it proposed to transfer him and his book of business to a partner firm.  Respondent Lynne Wallace, an executive of the partner firm, however, declined to allow Quan to transfer after being taken aback by Quan's conduct and demeanor following a meeting to discuss the transition.  As a result, Quan was terminated.  Quan claims, and Wallace denies, that Wallace made a racist and ageist remark about him at the meeting.

After he was terminated, Quan demanded that three former colleagues pay him hundreds of thousands of dollars under a side agreement covering the terms of his employment.  One of these colleagues asked respondent

1

Michael Holzman, Quan's then-current supervisor, why Quan was terminated, and Holzman gave a limited response.

Quan sued for age and race discrimination and related claims, as well as for invasion of privacy. The trial court granted respondents summary judgment on all causes of action, and Quan appealed. We reverse in part and affirm in part. We agree with Quan that there are triable issues of material fact on his causes of action for race and age discrimination, and we therefore reverse summary adjudication as to those and the related claims. But we disagree with him that a sufficiently serious privacy right was at issue when a few people discussed his termination after Quan first told them about it, and we therefore affirm summary adjudication as to his cause of action for invasion of privacy.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

The relationships among the various entities involved in this dispute are unclear, as they are not succinctly described in the record or in the parties' briefing. As we understand it, respondent Acrisure of California, LLC is an insurance company that owns various partner firms doing business under different names. One of these firms is respondent Vantreo Insurance Brokerage Firm, "a full-service brokerage firm offering a broad range of property/casualty, employee benefits, life insurance, long term care, personal insurance coverages, and risk management solutions."

Wallace, who is White, has been with Vantreo since 2008 and is the president and chief executive officer of the company. She is also an employee and officer of Acrisure, where she has worked since 2018. Holzman, who is also White, is the principal and chief operating officer (COO) of another Acrisure partner, Cumbre Insurance, where he started in 1991; and he has

2

been employed by Acrisure since 2015. He is based in Cumbre's Ontario, California office.

Quan is of Chinese descent, and he has worked in the insurance industry since 1977. He has an insurance broker's license and has been a certified insurance counselor since the mid-1980s. In 2015 he worked in Novato for a company that was acquired by Acrisure, and in October of that year he signed a producer agreement to work for Acrisure. As a "producer," Quan earned a commission instead of a salary. Around this time, he also entered into a side agreement with three colleagues.[1] The agreement limited the reasons Quan could be terminated and provided that the three men would pay Quan $300,000 if Acrisure terminated him without cause.

Quan worked for Cumbre in Novato after the Acrisure acquisition. His manager at the time was Harper, Cumbre's COO (*ante*, fn. 1). Quan eventually moved to the Cumbre office in Petaluma. As of 2018, there were three employees working in the Petaluma office. Quan was the only producer of Asian descent at Cumbre.

Holzman became Quan's direct supervisor in February 2018, when Harper left the company. Quan was 66 at the time. Holzman believed that the revenue of the Petaluma office no longer justified the amount of rent for the office. He discussed with other Acrisure partners the possibility of the

---

[1] The three colleagues were (1) James MacKenzie, who sold the firm where Quan worked to Acrisure in 2015, (2) Michael Hines, the former chief financial officer (CFO) of the firm that was sold to Acrisure who then became the CFO of Cumbre, and (3) Paul Harper, the COO of the firm sold to Acrisure who continued as COO after the sale. MacKenzie testified that they entered into the side agreement because he "thought that [Quan] still had things to add. I thought that he could help the company get some earn-out." Quan sued MacKenzie, Hines, and Harper for breach of contract and other claims for their failure to pay him after Acrisure let him go. These defendants were dismissed from the action after they settled with Quan.

Petaluma Cumbre employees sharing office space or renting desks in other Acrisure partner offices. As part of this process, in the summer of 2018, Quan attended a meeting with Cumbre and Vantreo employees at Vantreo's Santa Rosa office to discuss a possible office-sharing plan. Quan later told Holzman that he did not believe a transfer to the Santa Rosa office would work, and that it would be preferable to either secure a smaller office in Petaluma or for him to work from home.

Holzman ultimately decided to transfer the Petaluma Cumbre office business to the Santa Rosa Vantreo office, instead of having the two entities share office space. According to Quan, another meeting was held in the Petaluma office to discuss the transition. Quan did not attend, but he claims that a female employee of the Petaluma office told him that someone from Vantreo said during the meeting that "the younger producers" at Vantreo "were salivating at [Quan's] book of business." (This Petaluma employee later testified at her deposition that she did not recall the "salivating" comment or "anything along those lines.")

In mid-October 2018, Holzman traveled to the Petaluma office and told Quan and the two other Cumbre employees for the first time that he had decided to close the Cumbre Petaluma office and merge with Vantreo instead of having the entities share office space. Quan was "shocked."

Shortly after being told of the merger, Holzman, Quan, and one of the two other Cumbre employees (the same woman alleged to have heard the "salivating" comment) drove to Vantreo's Santa Rosa office to discuss the transition with Wallace and others. During the meeting, the other Cumbre employee had tears in her eyes and later said she had been "feeling rattled," though she was later described as "quite gracious."

4

The parties provided such contrasting versions of the meeting and its aftermath that it is almost as if they were describing different events. According to Quan, "the first thing out of Lynne Wallace's mouth was, 'I'm going to try to rejuvenate you,' or something to that effect." The remark offended Quan, who stated it "implied that I didn't know how to sell, after I'd been selling for 35 years." Quan responded that he was comfortable with where he was in that stage of his life. He later testified at his deposition that he and Wallace did not get off to a good start and that Wallace "didn't know me. She didn't know what I was capable of doing. To make an assumption that I had to be rejuvenated, that was insulting." Quan said that over his many years working in insurance, he had "develop[ed] a sixth sense of when people don't like you because of what you are. It happened many times in my career doing insurance. It's the condescending, the way they look down on you, the way they talk. And Lynne—even the rejuvenation statement that gave—you know, I immediately felt that way [that Wallace did not like Asians]." It was Quan's understanding after the meeting, though, that he would be joining Vantreo as a producer. He was "very impressed" with Vantreo's workers compensation system, and he believed "this could really work out well; I could sell again."

Wallace's version of the meeting was dramatically different. She testified at her deposition that she "would never say—even use that word, 'rejuvenate.' Never, never." She said she "could have said something like I would love to reinvigorate you or excite you. I want to show you some things you can get excited about." But she explained she knew "for sure" that she did not use the word "rejuvenate" because "I don't talk like that. Why would I say to somebody I want to rejuvenate you? There's no reason to. It makes no sense." Another Acrisure employee at the meeting later said she did not

believe Wallace used the word "rejuvenate," but that Wallace "did say something about getting him [Quan] excited or perhaps reinvigorated. And that would be a very typical Lynne thing to say to anybody." The other Cumbre employee at the meeting recalled that Wallace "was trying to be positive and have this be a positive move," and did not recall Wallace using the word "rejuvenate." Nor did she recall Quan saying after the meeting that he had felt insulted by Wallace. She later testified that she "d[id]n't recall the full conversation because my head was spinning." She said that on the ride back to Petaluma, Quan said something to the effect that "he was not going to do something or not going to do what they want him to do, something along those lines." When she and Quan were alone after they returned to Petaluma, she "t[old] him [Quan] that he should probably watch what he says in front of people."

According to Wallace, after the meeting Quan "caught [her] off guard. His response was, basically, look, I'm not interested in your technology. I don't plan on doing a lot of sales. I go to Hong Kong multiple times a year. And if you need me, and he picked up his phone, he said, this is how you get me, and just held his phone up in my face. [¶] And I was—yeah, I just, wow. I was like, you know— . . . we put the technology together to support people. But I realized, you know, at that moment, he wasn't interested really in Vantreo and all the stuff I'd been saying. He wasn't interested [in] Vantreo, and he wasn't interested in helping Vantreo. He was very adamant about telling me how it would be if he was going to be here and how he would work with us." According to Wallace, Quan told her, "Don't count on me for selling. I'm not going to be using your technology. And I'll take care of my clients. If you need me, you call me, get me on the cell phone." Wallace said she had "never had a situation like that ever before" where she "didn't even get the

6

sense that he wanted to be a part of Vantreo." For his part, Quan denied he said something negative about Vantreo's technology, because "I don't feel that way. . . . I'm very high on technology." When asked at his deposition whether he mentioned during the meeting that he took overseas trips, he responded, "No. Why would I do that?" and said he had traveled to Hong Kong only once, in 2013. Quan said it was "conceivable" that he mentioned something to the effect that he was available to his clients "24/7" because "they all have my phone numbers, and I do a lot of my work that way."

Based on Quan's statement and conduct, Wallace decided within a week of the meeting "not [to] bring [Quan] onboard at Vantreo." She later explained she "did not want to be put in a position of taking somebody on and then having to let them go or part ways because we can't operate like that. So that's why I said, you know, this isn't going to work." She told Holzman that she thought Quan would not be a good fit at Vantreo.

A human resources consultant from Acrisure traveled from Michigan in early December to hand deliver Quan a letter informing him that his position was being eliminated effective December 31, 2018. He was provided with a form "Notice to Employee as to Change in Relationship" stating that Quan's employment status would change on December 31 as follows: "POSITION ELIMINATED."[2] A separate "Employee Change of Status Form" in the

_____

[2] Quan's complaint repeatedly alleges that his termination letter informed him he was being let go due to a "reduction in force," though the form notice does not use those specific words. Respondents' moving papers likewise referred to a "reduction in force," and multiple witnesses testified that this was the reason given in the termination letter. Holzman's declaration in support of summary judgment referred to an attached "Notice to Employee as to Change in Relationship," which describes the form that appears elsewhere in the record, but the declaration's attachments do not appear in the appellate record. Again, though, the form document does not use the term "reduction in force."

7

record has a box checked by the text "Termination," and the "reason" listed is "Position Eliminated–Severance Pending." Quan told the person who informed him of the termination that be believed he was being fired due to age discrimination.

After he was terminated, Quan sought payment under the side agreement. Before his official termination date, Quan spoke on the phone with his former manager, Harper (who had left the company earlier that year but who still worked as a consultant), about his termination. According to Quan, Harper told him "that's ridiculous, nobody—no one fires a producer with a book of business." Quan said he thought that the real reason he was fired was because of discrimination. Quan forwarded to Harper the side agreement.

Holzman and Harper spoke regularly on the phone since Harper was working as a consultant, and during one call in December 2018 Harper asked Holzman what had happened with Quan. Holzman explained to Harper that Quan had been let go as part of a reduction in force. During a second conversation, Holzman told Harper that Quan "hadn't advocated for himself or performed very well in the meeting [at Vantreo's office] and that it wasn't going to go forward." When asked later whether he believed Quan had a right to privacy around the loss of his employment, Holzman testified that he "was sharing information that Mr. Harper already knew about Mr. Quan's performance in the past. I didn't feel I was sharing anything that he didn't already know." When another person who worked more directly with Holzman asked why Quan was let go, Holzman did not share the reasons and instead directed the person to human resources.

Quan also contacted MacKenzie (the man who had sold Quan's former firm to Acrisure). Quan requested payment under the side agreement, told

8

MacKenzie that if he wasn't immediately paid $250,000 he was going to get a lawyer, and forwarded to MacKenzie the side agreement as well as the letter terminating him.

Harper also discussed Quan's termination with Hines (Cumbre's former CFO), after Quan said he should be paid under the agreement. Hines later testified that he learned during one of the conversations that "Acrisure had terminated Mr. Quan because they got tired of paying $200,000 for somebody that was doing nothing, and that he rarely came to the office."

The three men who Quan had asked for payment under the side agreement secured legal counsel. Hines emailed counsel about another Cumbre employee who had been a "problem" and so was offered a plan to "ease him out" over a period of five years, a deal that the former employee considered "immensely fair." Counsel asked why such an offer was not offered to Quan, and Hines responded, "Bill was not one of the 'guys' which, I suspect, is the reason he was treated differently!"

Counsel ultimately prepared an opinion letter, which stated that since Quan was fired for just cause, the three men were not required to pay Quan under the terms of the agreement. Hines testified the reasons given for Quan's termination were consistent with the men's "12 years of history with Mr. Quan" because they "ha[d] an idea of what . . . his [Quan's] performance would otherwise look like." Quan's former supervisor, Harper, likewise said Quan was sometimes obstinate and difficult to manage over their 15-year working relationship. He acknowledged at his deposition that he was not present at the October 2018 meeting when Quan was alleged to have been obstinate, but Harper testified that the comments he was alleged to have made were consistent with Quan's history.

Shortly after Quan was let go, he asked his former coworker at the Petaluma office to sign a statement attesting that (1) she had heard Wallace tell Quan during the October 2018 meeting that Wallace needed to "rejuvenate" him and (2) at another meeting a Vantreo employee had said that younger producers were "salivating" at Quan's book of business. The coworker did not sign the statement.

The Petaluma Cumbre branch was closed in 2019, and the office's business was transferred to Vantreo. After the transfer, Quan's business was managed by three people: (1) the account manager who had worked with Quan at Cumbre—the one who was also at the October 2018 meeting and was transferred over to Vantreo (a White woman who was 62 at the time respondents filed their summary judgment motion), (2) a Vantreo producer, a White man who was 52 at the time of summary judgment, and (3) another Vantreo producer, a 63-year-old White woman.

Quan in August 2019 sued respondents (along with others who have since been dismissed from the lawsuit and are not parties to this appeal). As amended, and as relevant to this appeal, Quan's complaint alleged causes of action against Acrisure/Vantreo for race discrimination in violation of California's Fair Employment and Housing Act (Gov. Code, § 12900 et seq, FEHA), age discrimination in violation of FEHA, failure to prevent discrimination, and unjust enrichment. Quan also alleged causes of action against all respondents for invasion of privacy and negligent infliction of emotional distress.

Respondents in March 2022 filed a motion for summary judgment or, in the alternative, summary adjudication. With their motion, they submitted information to establish the business justification for closing the Petaluma Cumbre office, such as fiscal information showing that the office had lower

10

earnings than other divisions, branches, and departments. They also submitted a 37-page separate statement of undisputed material facts (Code Civ. Proc., § 437c, subd. (b)(1)).[3] It listed 200 material facts, though many were duplicates and simply listed under multiple causes of action. A hearing date of July 8, 2022, was scheduled.

Quan opposed the motion. He also filed an "opposition" to respondents' separate statement of undisputed material facts that spanned 491 pages. And he submitted his own 88-page separate statement of undisputed facts.

Respondents filed a reply and also submitted evidentiary objections to some of Quan's evidence. Although they argued that Quan's separate statement of undisputed fact was improper, they nonetheless responded to it. As discussed in more detail below, they also submitted additional evidence. This evidence included a declaration from Holzman that (1) responded to facts Quan had asserted in his opposition, and (2) attached four documents not included with respondents' moving papers, discussed in further detail below. The additional evidence included more excerpts from various depositions.

The day before the hearing on respondents' motion, Quan filed an ex parte application for an order excluding the additional evidence that respondents submitted in support of their reply brief. He also filed an "*Ex Parte* Application for Order Granting Plaintiff the Right to Include Additional Evidence Just Produced in Support of His Opposition to Defendants' Motion for Summary Judgment and of Notice to Defendants." (Emphasis omitted.) His attorney contended that she had long sought testimony and documents from the attorney who had provided the legal opinion that Quan need not be

---

[3] All undesignated statutory references are to the Code of Civil Procedure.

11

paid under the side agreement. The attorney produced 70 pages of documents three days before the scheduled hearing on the summary judgment motion, including the email in which Hines told counsel that Quan was "not one of the 'guys.'" Quan claimed that these documents supported his contention that Cumbre had a practice of transitioning older producers into retirement over a five-year period instead of hastily letting someone go as they did with him. He also claimed that the documents supported his contention that Holzman had shared with others the reason Quan was let go.

Respondents opposed both ex parte requests. They contended that they submitted additional evidence to respond to Quan's statement of additional disputed facts. As for the documents recently produced by the law firm, they argued they were inadmissible hearsay. The trial court allowed respondents to provide the additional evidence they submitted with their reply and denied Quan's request to present the documents produced by the law firm.

The trial court then granted summary judgment in favor of respondents. The court characterized Quan's separate statements as "inadequ[ate]," "unusable," and "useless as a tool for the Court to analyze the motion and focus on the true factual issues in dispute" and granted summary judgment on that basis. Mindful of the preference for addressing cases on their merits, though, the court proceeded to consider the parties' substantive arguments. It sustained respondents' evidentiary objections to four declarations Quan submitted with his opposition. As Quan has not challenged those rulings on appeal, we do not consider either the correctness of the rulings or the evidence not considered by the trial court. (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1113.)

The court granted summary judgment in respondents' favor on Quan's cause of action for race discrimination on the basis that there was no

12

evidence of race discrimination or disparate treatment. And it granted summary judgment in respondents' favor on Quan's cause of action for age discrimination on the basis that respondents had shown that Quan would not be able to establish that he was replaced by "a significantly younger person." According to the trial court, even if Wallace had said that Quan should be "rejuvenated," as Quan alleged, this stray remark "d[id] not directly relate to age." Because the discrimination claims failed, the court granted summary judgment in favor of respondents on the derivative causes of action for failure to prevent discrimination, unjust enrichment, and negligent infliction of emotional distress. Finally, the court granted summary judgment in favor of respondents on Quan's cause of action for invasion of privacy, as the court found that respondents had shown there was no violation of a sufficiently serious privacy interest.

Quan appealed from the ensuing judgment.

## II.
### DISCUSSION

*A. We Reject Quan's Challenges to the Trial Court's Procedural Rulings.*

1. It is unnecessary to consider Quan's arguments about his separate statements of fact.

Quan first argues that the trial court abused its discretion by "[d]isregarding" his opposition to respondents' separate statement of undisputed fact and his own statement of disputed facts. (Bold omitted.) He argues that his statements complied with the requirements of section 437c, subdivision (b)(3). And he contends he should have been granted leave to cure any possible procedural defects. But any ruling regarding the separate statements of fact is moot since the trial court, after acknowledging the

13

preference to consider cases on their merits, proceeded to consider Quan's opposition.

At oral argument, respondents' counsel insisted that this issue is not moot since the trial court granted summary judgment on this basis and that we may affirm this ruling without reaching the merits as the trial court did. We reject this approach. *Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197 (*Parkview Villas*), upon which the trial court relied in proceeding to the merits, is instructive. There, the trial court concluded, as did the trial court did here, that the plaintiff had submitted an inadequate separate statement of material fact. (*Id.* at p. 1208.) Unlike here, though, the court did not reach the merits of the plaintiff's opposition to summary judgment. (*Ibid.*) The appellate court found that although the trial court's dissatisfaction with the plaintiff's deficient separate statement was "understandable" (*id.* at p. 1216), it was nonetheless an abuse of discretion to grant the defendant's motion without providing the plaintiff an opportunity to correct the deficiencies, since the defects did not prevent the defendant from responding in its reply brief or at oral argument. (*Id.* at pp. 1210–1211.)

*Parkview Villas* noted that despite the plaintiff's failure to comply with the rules regarding separate statements, "[i]t certainly would have been within the trial court's discretion to proceed to the merits of [the defendant's] motion." (*Parkview Villas*, *supra*, 133 Cal.App.4th at p. 1212.) This is essentially what the trial court did here. True, the court's order states that respondents' motion was "GRANTED on the basis of [Quan's] deficient separate statement in opposition." But the court followed *Parkview Villas*'s direction by addressing the case on its merits. (*Id.* at pp. 1212–1213.) This promoted the public policies favoring addressing cases on their merits and

14

resolving doubts in favor of the party seeking relief from a procedural default. (*Id.* at pp. 1212–1213.) These policies remain in effect on appeal. We thus reject respondents' argument that we should affirm based on a procedural defect without considering the merits.

### 2. The Trial Court Did Not Abuse Its Discretion in Considering Evidence Submitted in Support of Respondents' Reply.

Quan next argues that the trial court abused its discretion by admitting evidence that respondents submitted in support of their reply brief. We are not persuaded.

An opposition to a summary judgment motion shall include a separate statement that responds to each of the material facts that the moving party claims is undisputed. (§ 437c, subd. (b)(3).) "The statement also shall set forth plainly and concisely any other material facts the opposing party contends are disputed." (*Ibid.*) The moving party shall serve and file any reply to the opposition at least five days before the noticed hearing date. (§ 473c, subd. (b)(4).) Although the summary judgment statute does not specifically contemplate evidence in support of a reply, it does provide that summary judgment is appropriate "if all the papers submitted" demonstrate there is no triable issue of material fact. (§ 473c, subd. (c).) "A trial court has discretion to consider new evidence in reply papers supporting a summary judgment motion as long as the opposing party has notice and an opportunity to respond. [Citation.] Evidence which is used to fill gaps in the original evidence created by the opposition is particularly appropriate to consider in a reply." (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 499.)

In its order granting summary judgment, the trial court concluded that the evidence respondents submitted in reply was "in direct response to

15

[Quan's] separate statement of additional facts." Nowhere in Quan's opening brief does he address this finding. Nor does he articulate how any particular piece of evidence was inappropriate. He notes that he argued below that he would be prejudiced if he were deprived of the opportunity to respond to the evidence. This suggests that had he had additional time, he would have been able to refute the evidence or explain what additional information he needed to address it. But now that he has that opportunity, he offers no such response.

As he did below, Quan relies on *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, which focused on whether evidence may be considered if it is not mentioned in a moving party's separate statement of undisputed facts. (*Id.* at pp. 312–313.) There, a landlord defendant filed a motion for summary judgment and argued that it had satisfied its duty to offer a plaintiff tenant a right of first refusal. (*Id.* at p. 312.) In opposition, the plaintiff (tenant's assignee) submitted evidence that the right of first refusal was procured by fraud. (*Ibid.*) In reply, the landlord submitted a "supplemental declaration" that contained new facts not referenced in its separate statement. (*Id.* at pp. 312–313.) The appellate court held that it was within a trial court's discretion to consider evidence not referenced in a moving party's separate statement. (*Id.* at p. 316.) The court held that the trial court there had abused this discretion because it considered evidence that was not only omitted from the separate statement, but *also* was not filed until after the plaintiff had responded to the issues raised in the moving party's opposition, thus violating the opposing party's due process rights. (*Ibid.*) " 'The due process aspect of the separate statement requirement is self evident—to inform the opposing party of the evidence to be disputed to defeat the motion.' " (*Ibid.*)

16

Again, Quan does not identify any specific evidence that he was unaware he had to dispute in order to defeat respondents' motion. Nor does he address the trial court's conclusion that the evidence was submitted in response to Quan's own statement of disputed fact. In short, Quan has not demonstrated that the trial court abused its discretion in considering the evidence.

      3.  It is unnecessary to consider Quan's arguments about his late-filed evidence.

Finally, Quan contends that the trial court abused its discretion when it denied his request to submit additional evidence the day before the hearing on the summary judgment motion. It is somewhat unclear why the trial court denied the request, though it appears it may have been because the documents were not timely presented. (§ 437c, subd. (b)(2) [opposition to motion for summary judgment shall be served and filed 14 days before hearing date unless court orders otherwise for good cause].) Quan argues that the documents he tried to submit were relevant to both his discrimination claims and his claim for invasion of privacy. We need not decide whether the trial court abused its discretion in declining to consider Quan's late submission, however, because we conclude that Quan established a triable issue of fact with respect to his discrimination causes of action even without the documents, and because we further conclude that his invasion of privacy cause of action would fail even if the documents had been admitted.

*B. General Legal Principles Governing Discrimination Claims on Summary Judgment and the Standard of Review.*

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment."

17

(*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*).) "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz* at p. 354.)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination." (*Guz, supra,* 24 Cal.4th at p. 354.) The elements of a prima facie case may vary depending on the circumstances, but in general "the plaintiff must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Id.* at p. 355.) If the plaintiff establishes this prima facie case at trial, a rebuttable presumption of discrimination arises. (*Ibid.*) The burden then shifts to the employer to rebut the presumption by showing that the adverse action was taken "for a legitimate, nondiscriminatory reason," in which case "the presumption of discrimination disappears." (*Id.* at pp. 355–356.) The plaintiff must then show that the reasons given were pretextual or that there was other evidence of discriminatory motive. (*Id.* at p. 356.) "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Ibid.*)

"The *McDonnell Douglas* framework was designed as 'an analytical tool for use by the trial judge in applying the law, not a concept to be understood and applied by the jury in the factfinding process.' [Citation.] '[I]n the usual case, the first two prongs of the [framework], that is, whether the plaintiff has stated a prima facie case of discrimination and whether the employer has rebutted that prima facie showing, will be tested prior to trial,' such as through a motion for summary judgment. [Citation.] Because the framework is an analytical tool for evaluating the legal merits of a claim, it 'does not affect the procedural rule . . . that imposes on a defendant the initial burden when that party seeks summary [judgment].' " (*Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 737 (*Abed*).) In applying the *McDonnell Douglas* burden-shifting analysis on summary judgment, the trial court will determine whether the parties have created an issue of fact to be decided by a jury. (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 309.)

A trial court shall grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (§ 437c, subd. (c).) "On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz, supra,*

19

24 Cal.4th at p. 334.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts surrounding the evidence in favor of that party. (*Abed, supra*, 23 Cal.App.5th at p. 738.) Although summary judgment is not a disfavored procedure in California, many employment cases involve issues of intent and motive, issues not determinable on paper and rarely appropriate for disposition on summary judgment. (*Id.* at p. 739.)

### C. *There Is a Triable Issue of Fact Over Whether Quan Was Subject to Discrimination on the Basis of Race.*

Quan first contends that there is a triable issue as to whether respondents discriminated against him on the basis of race in violation of FEHA. We agree.

FEHA prohibits an employer from discharging a person from employment because of the person's race. (Gov. Code, § 12940, subd. (a).) In the trial court, respondents apparently did not dispute two of the elements of a prima facie case of discrimination: that Quan is a member of a protected class (of Asian descent) and that he suffered an adverse employment action when he was terminated. (*Guz, supra*, 24 Cal.4th at p. 355.) And although they presented evidence that Quan was not meeting Cumbre's expectations, they apparently did not argue for purposes of the prima facie showing that Quan was not performing his job satisfactorily. (*Ibid.*) They instead argued that there was no evidence that "even remotely suggest[ed] a discriminatory motive based on race."[4] And they contended that even if Quan were able to establish a prima facie case of discrimination, he would be unable to show

---

[4] Quan contends that respondents somehow waived the argument that he failed to establish a prima facie case of discrimination because they did not argue the issue below. This argument is belied by respondents' moving papers in the trial court.

20

that the reasons for his termination were pretextual.  The trial court concluded that because Quan was the only producer at the Petaluma Cumbre branch, he would be "unable to prove the element that others were retained in similar jobs or that his job was filled by a comparable individual not in the class."  And it further concluded that there was no other circumstantial evidence to suggest race discrimination or disparate treatment.

On appeal, Quan contends that he established a prima facie case of race discrimination.  He first focuses on the three elements that were not really contested below:  his membership in a protected class, his satisfactory performance, and the fact he suffered an adverse employment action.

As for the fourth element, evidence of discrimination, the trial court focused narrowly on whether people not in Quan's protected class were retained in similar jobs or whether his job was filled by individuals of comparable qualifications not in the protected class, as opposed to more broadly on whether there was "some other circumstance suggest[ing] discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.)  The court relied on *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1318, decided before *Guz*.  As *Mixon* acknowledged, though, "the precise elements of a prima facie case [under the *McDonnell Douglas* framework] w[ill] vary according to differing theories of discrimination and different factual situations." (*Mixon* at p. 1317, citing *McDonnell Douglas*, *supra*, 411 U.S. at p. 802, fn. 13.)  " '[T]he precise requirements of a prima facie case can vary depending on the context and were "never intended to be rigid, mechanized, or ritualistic." ' " (*Abed*, *supra*, 23 Cal.App.5th at pp. 739–740, quoting *Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506, 512.)  Here, if Quan established a triable issue of fact on whether there was a

21

discriminatory motive, it does not matter whether Quan was or was not replaced, or what the race of a replacement was.

Both parties characterize the facts in such a way as to fit the cases they cite without an appreciation of what the undisputed facts actually show. Although the parties dispute how productive and effective Quan was at the time the transfer was announced, no one has suggested that respondents intended to fire him on that basis before the mid-October 2018 meeting with Wallace. Both in her declaration supporting summary judgment and in her deposition testimony, Wallace said she decided not to bring Quan to Vantreo based on his behavior at the meeting, because she did not believe he would be a good fit at the company. True, the letter terminating Quan states that his position was being eliminated, and his firing was later characterized as a reduction in force. But this was not a classic reduction in force, where a company decides it will eliminate a certain number of people for business reasons and is accused of discrimination based on who is selected *after* the decision to reduce headcount is made. (E.g., *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1008 [plaintiff who was target of company-wide reduction in force claimed he was selected for discriminatory reasons and not pursuant to the standardized criteria identified by defendant employer].) Holzman testified that after Wallace decided she did not want to bring Quan to Vantreo, he decided "to go forward with a reduction in force." In other words, the evidence shows that Quan, and only Quan, was terminated as a result of the withdrawal of his potential transfer to the Santa Rosa Vantreo office, which occurred after the mid-October 2018 meeting.

Harper, Quan's former manager, explained at his deposition how this case differed from a traditional reduction in force. He said it "doesn't make sense to terminate a—a commission producer. What does make sense, if

22

you're going to protect your business through a reduction in force, is to reduce fixed costs such as salaries, not elastic income that's relative to a book of business, or other means, technology, go through the gambit of things. But it doesn't make sense to terminate a producer who's paid a portion of his or her book in order to protect the business." Although Harper was not involved in the decision to terminate Quan, his answer is consistent with other testimony that Holman and Wallace initially planned to close the Petaluma office to cut costs but retain Quan.

As this was not a classic reduction-in-force situation, we agree with Quan that he established a prima facie case of race discrimination by showing circumstances suggesting discrimination. (*Guz*, *supra*, 24 Cal.4th at p. 355.) He was the only producer of Asian descent at Cumbre. Quan testified that he believed after his mid-October 2018 meeting with Wallace that she had been condescending to him and did not like him because he was Asian. Wallace denied making the "rejuvenation" comment that Quan said offended him, but she acknowledged that of all the other insurance firms that Vantreo had brought on over the years, Quan was the only employee she ever

disallowed transferring to Vantreo.[5]  It may well be that a jury ultimately concludes that this was because no one had offended Wallace the way Quan had and that her reaction was unrelated to his race, but this is not an issue that can be resolved on summary judgment.

Given the parties' disputes over what was said at the meeting, Quan's conduct and demeanor at the meeting, and what was said after the meeting, respondents have not offered legitimate, nondiscriminatory reason for the termination that would negate Quan's race discrimination claim *on summary judgment*.  (*Guz, supra*, 24 Cal.4th at p. 355–366.)  The resolution of these disputed issues will necessarily turn on a fact finder's determination of credibility, an issue not appropriate for summary judgment.

Respondents argue that they rebutted any prima facie case of discrimination by offering undisputed evidence of non-discriminatory reasons for "eliminating [Quan's] position—*i.e.*, reasons unrelated to age or race."  We cannot agree.  It is certainly undisputed that respondents had planned to

---

[5] In his opening brief, Quan notes that Vantreo "brought in every Caucasian producer whose book it had purchased," an argument that his attorney repeated at oral argument.  That does not mean that all the employees it brought on were White.  In response to a special interrogatory about the race of people who were retained or who transferred to Vantreo when the company purchased their company's book of business, Vantreo identified one mixed-race and two White senior account managers; four White, three Hispanic, one Asian, and two African-American account managers; one Hispanic and two White associate account managers; one White producer; one Asian, two Hispanic, and seven White employees with various broker titles; two White principals; and one White associate; along with various other executive and administrative employees, including an Asian account executive/customer service representative and one Asian file clerk.  Respondents' counsel suggested at oral argument there was thus no pattern and practice of discrimination.  Be that as it may, the evidence fails to establish as a matter of law that that Vantreo did not act with discriminatory intent when it declined to accept Quan into the firm.

*close the Petaluma Cumbre office.* And the evidence respondents point to on appeal certainly establishes that there were legitimate, nondiscriminatory reasons for *that* decision (as opposed to the *separate* issue of disallowing Quan's transfer to the Santa Rosa Vantreo office and terminating him). The earnings of the Petaluma office had dropped, the office lease was expiring, and Holzman had decided there were economic benefits to closing the office and transferring its business to the Santa Rosa Vantreo office. Quan contends that these reasons were "false." But this is not a typical situation where such reasons are given to rebut a prima facie case and the court must determine if the reasons given are nondiscriminatory. Here, the record reveals that these reasons did not actually play into the decision to end Quan's employment. Instead, as respondents' brief acknowledges, Wallace "decided against bringing [Quan] to Vantreo" "*[b]ecause of [Wallace's] impression*" at the October 2018 meeting that Quan was "not interested" in joining the firm. (Italics added.) Respondents contend that Wallace's "impression" was "corroborated" by Quan's 2017 sales performance and by a September 2018 email Quan sent only to Holzman stating that he (Quan) should be able to make around $1,000 a month in new commissions in 2019, or $25,000 for the year. But there is no indication whatsoever that these were the actual reasons that Quan was terminated.

Respondents claim that following the mid-October meeting, there was a "reduction-in-force which eliminated [Quan's] position." This may be how respondents characterized Quan's termination in the company's notice to him. But again, given the sharply different accounts of the October meeting, the question is whether Quan was denied a transfer and ultimately fired for his demeanor and behavior or whether respondents were motivated by discriminatory reasons.

25

Because respondents did not rebut Quan's prima facie case of discrimination, the burden did not shift back to him to establish that the reason given was pretextual. We conclude that there was a triable issue of fact over whether Quan suffered race discrimination in violation of FEHA, and we therefore reverse the grant of summary adjudication on this cause of action.

### D. There Is a Triable Issue of Fact Over Whether Quan Was Subject to Discrimination on the Basis of Age.

Quan next contends that there is a triable issue of fact as to whether respondents discriminated against him on the basis of age in violation of FEHA. We again agree.

FEHA prohibits an employer from discharging a person because of age. (Gov. Code, §§ 12926 ["age" refers to person over 40], 12940, subd. (a).) Quan argues, as he did below, that it was unnecessary to conduct the *McDonnell Douglas* burden-shifting analysis on this claim since Wallace's alleged "rejuvenate" comment amounted to *direct* evidence of age discrimination. (E.g., *Zampierollo-Rheinfeldt v. Ingersoll-Rand De P.R., Inc.* (1st Cir. 2021) 999 F.3d 37, 50 (*Zampierollo-Rheinfeldt*) ["If the plaintiff 'provides direct evidence of discrimination, the issue may be put to a finder of fact without further ado.' "].) *Zampierollo-Rheinfeldt* is instructive. There, the plaintiff's supervisor decided to eliminate the plaintiff's position as part of a reduction in force and reorganization of a company. (*Id.* at pp. 43–44.) The supervisor told the plaintiff he was being let go because the supervisor "wanted to 'rejuvenate the region,' was seeking the 'rejuvenation of the team,' was 'rejuvenating the management,' and was 'rejuvenating the management team,' in addition to wanting to reduce its costs." (*Id.* at p. 51, fn. omitted.)

26

The appellate court held that this was sufficient direct evidence of age discrimination to survive a motion for summary judgment. (*Id.* at pp. 52, 60.)

Respondents argue that *Zampierollo-Rheinfeldt* is distinguishable because here, Wallace's statement was "inherently ambiguous" and thus did not qualify as direct evidence. (*Zampierollo-Rheinfeldt*, *supra*, 999 F.3d at p. 55.) "A statement is inherently ambiguous if, viewed in context, it is subject to be interpreted in a benign, non-discriminatory way." (*Ibid.*) But "[t]he fact that a jury would not be *compelled* to find a statement was direct evidence of discrimination does not make it inherently ambiguous *so long as a jury could conclude it was*. An 'inherently ambiguous' statement is not susceptible of being reasonably found to be direct evidence precisely because its inherently ambiguous nature would make such a characterization of it merely speculative." (*Ibid.*, italics added.) Respondents claim Wallace's comment was ambiguous since Wallace testified she used a different word ("reinvigorate") and that, in any event, the remark could "*only* be reasonably construed as an attempt to generate enthusiasm for the use of new technology to increase new sales and service clients." (Italics added.) These are all reasons a jury might not be *compelled* to find the statement was direct evidence of discrimination, but that does not make the statement inherently ambiguous. While Wallace's alleged comment was not as strong evidence of discriminatory animus as that presented in *Zampierollo-Rheinfeldt*, we agree with Quan that it was sufficient direct evidence to survive summary judgment.

Even if we were to proceed with the *McDonnell Douglas* burden-shifting analysis, we would still conclude that there are triable issues of fact. Again, the elements of a prima facie case of discrimination are that (1) the plaintiff was a member of a protected class, (2) the plaintiff was performing

27

competently in the position he or she held, (3) the plaintiff suffered an adverse employment action, and (4) "*some other circumstance suggests discriminatory motive.*" (*Guz, supra*, 24 Cal.4th at p. 355, italics added; see also *Foroudi v. The Aerospace Corp., supra*, 57 Cal.App.5th at p. 1007.) As with Quan's race-discrimination claim, the trial court narrowed the scope of the prima facie case. Relying on *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1116, the trial court stated that the fourth element of a prima facie case in an age-discrimination case is that "the employee was replaced in his or her position by a significantly younger person." And it concluded that Quan could not establish a triable issue of material fact since "he was [not] replaced by a significantly younger person."

At least one court has questioned whether being replaced by a "significantly younger person" is an element of a prima facie case of age discrimination. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1003 & fn. 3 ["It is not entirely clear that this last element is a required part of the employee's prima facie case."].) *Guz* considered comparative-age evidence in determining whether an inference of age discrimination was sufficient to survive summary judgment. (*Guz, supra*, 24 Cal.4th at pp. 367–368.) True, being replaced by someone "substantially younger than the plaintiff" may amount to "a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class" but who is only a year or so younger than the plaintiff. (*O'Connor v. Consolidated Coin Caterers Corp.* (1996) 517 U.S. 308, 313 [in alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., plaintiff need not show that he or she was replaced by someone outside the protected class (under 40)].) But the important factor is whether there is "at least a logical

28

connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.' " (*O'Connor* at pp. 311–312.) Here, Quan raised such a logical connection when he presented evidence, while disputed, that Wallace told him he needed to be "rejuvenated." As does the ADEA, FEHA "bans discrimination against employees because of their age" (*O'Connor* at p. 312), and Wallace's alleged comment supported a discriminatory motive in terminating Quan.

Respondents place undue reliance on *Smith v. International Brotherhood of Electrical Workers* (2003) 109 Cal.App.4th 1637. In *Smith*, the person who fired the plaintiff union organizer told the plaintiff that "I'm letting you go . . . for your own good. What you need to do is rest and recuperate and look out for your family." (*Id.* at p. 1644.) The plaintiff was further told that "[y]ou aren't getting any younger; in fact you are older than I am." (*Ibid.*) Although these remarks, if true, could not be a much clearer suggestion of discriminatory motive (*Guz*, *supra*, 24 Cal.4th at p. 355), *Smith* concluded that the plaintiff had not established a prima facie case of age discrimination on summary judgment since he was not replaced by a significantly younger organizer and his duties instead were divided among remaining organizers. (*Smith* at pp. 1657–1658.) The court reached this result even though it found that the same remarks amounted to sufficient evidence to raise a triable issue of fact on the plaintiff's cause of action for disability discrimination. (*Id.* at p. 1656.) A rule that would categorically permit an employer to fire an employee based on age so long as the employee is not replaced, or is replaced with someone who is not significantly younger than the discharged employee, is inconsistent with FEHA.

We find support for our conclusion in *Begnal v. Canfield & Associations, Inc.* (2000) 78 Cal.App.4th 66. There, a jury found that a plaintiff had suffered age discrimination even though she was replaced with someone who was older than her. (*Id.* at pp. 68, 71.) In reversing a grant of judgment notwithstanding the verdict, this court concluded that being replaced by an older employee does not *conclusively establish* the absence of discrimination based on age. (*Id.* at pp. 68–69, 76.) Although the court purportedly did not decide whether being replaced by an older employee precludes the ability to establish a prima facie case (*id.* at p. 73, fn. 7), it emphasized the difference between *permitting* an inference of age discrimination based on the age of a replacement and *precluding* such an inference. (*Id.* at p. 74.) "[T]o hold that evidence that an employee is replaced by an older person conclusively establishes the absence of age discrimination would provide an employer who had actually discriminated based upon age with an absolute defense." (*Ibid.*) Likewise here, the fact Quan was not replaced with someone significantly younger than him does not provide respondents with an absolute defense.

Respondents also rely on *Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, but that case is inapposite. There, the plaintiff was working as an operation manager of a waste-management company when the defendant acquired the company. (*Id.* at p. 797.) The new company restructured the plaintiff's job to make it consistent with its other comparable positions, and terminated the plaintiff after his supervisor concluded that the plaintiff was not qualified for the restructured position. (*Id.* at p. 798.) The court concluded that there were no genuine issues of material fact since the defendant had a legitimate, nondiscriminatory reason for firing the plaintiff, and "[w]hen an employer modifies its workforce for business reasons, it has

30

no obligation to transfer an employee to another position within the company." (*Id.* at pp. 799–800.)  Again, there is no real dispute here that respondents had legitimate business reasons for closing the Petaluma office. The question is whether *Quan, in particular,* was terminated for legitimate, nondiscriminatory reasons.  Wallace's alleged "rejuvenate" comment supports an inference that he was not.[6]

We recognize that respondents have raised a strong inference that no discrimination occurred here.  Everyone seems to agree that the mid-October 2018 meeting did not go well, and some acknowledged that it might not have been ideal to hold it on the same day that the Petaluma employees were told that they would be transferred to a new office and were changing firms. Another Vantreo employee at the meeting testified that it was "[c]ertainly not how [she] would have handled it."  When asked about the short notice Quan was given of his employment change before the meeting, Holzman acknowledged that he was "not a super empathetic person" and said that "from an employment status, it was simply working with another branch.  I did not—I thought it was going to be a better situation for [the Petaluma employees]."  It is certainly conceivable that Wallace decided not to let Quan transfer for legitimate and nondiscriminatory reasons.  But "even if a 'strong inference' of no discrimination exists, this [is] not . . . a reason to grant summary judgment in [an employer's] favor.  A strong inference is just that—

---

[6] We give little weight to the other alleged comment that Quan highlights on appeal, that a Vantreo employee supposedly told a Cumbre employee that younger producers were "salivating" over Quan's book of business.  Quan did not hear this comment firsthand, the person who supposedly heard it did not recall such a comment, and the person who supposedly made it likewise denied doing so.  And as the trial court stated in its order on summary judgment, even if the comment was made, there is no evidence that it influenced the decision to terminate Quan.

an inference. The fact that a juror could reasonably draw a different inference is sufficient to preclude summary judgment." (*Sandell v. Taylor-Listug, Inc.*, *supra*, 188 Cal.App.4th at p. 324, citing § 437c, subd. (c) ["summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact"].) In short, whether Quan was discriminated against remains a disputed issue of fact, even though a trier of fact might may ultimately side with respondents.

### E. Summary Adjudication on Quan's Derivative Claims Must Also Be Reversed.

The trial court granted summary adjudication on Quan's causes of action for failure to prevent discrimination, unjust enrichment, and negligent infliction of emotional distress. The reason given for all three rulings was that the claims were derivative of Quan's causes of action for race and age discrimination. Because we have reversed summary adjudication on those two cause of action, we reverse summary adjudication on the derivative claims as well.

### F. Quan Did Not Establish a Sufficiently Serious Invasion of a Privacy Interest to Support a Claim for Invasion of Privacy.

Finally, Quan challenges the grant of summary adjudication on his cause of action for invasion of privacy. We agree with the trial court that the claim fails as a matter of law because Quan has not shown a sufficiently serious breach of social norms.

"[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious

invasion of privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39–40 (*Hill*).) "Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." (*Id.* at p. 40.) " ' "[A]ctionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." ' " (*Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419, 429.)

Quan's complaint alleged that he had a reasonable expectation of privacy in the reasons his employment ended. According to the complaint, all respondents violated that right to privacy when his former colleagues contacted Holzman "and/or" Wallace to discuss the reasons he was let go. Quan alleged that this was done "without [his] knowledge much less his authorization." He further alleged that the opinion letter explaining why there was no requirement for him to be paid under the side agreement included "false claims of non-performance." According to the complaint, the "false allegations" in the letter were the result of discussions about his termination that "clearly violated [Quan's] right to privacy."

The trial court first found that respondent Wallace established that she never talked to the colleagues, and thus summary adjudication in her favor was appropriate. Quan apparently conceded this point in the trial court, and he does not argue otherwise on appeal. We thus need not further address summary adjudication on this cause of action as to Wallace.

As for his claim against the other respondents, we seriously question whether Quan had a reasonable expectation of privacy under the circumstances. (*Hill*, *supra*, 7 Cal.4th at p. 40; see *Rosales v. City of Los Angeles*, *supra*, 82 Cal.App.4th at pp. 423, 428–429 [plaintiff police officer could have no reasonable expectation that his personnel records would not be disclosed in litigation regarding his alleged sexual misconduct].) He stressed below, and stresses again on appeal, that he did not give Holzman permission to speak with anyone about the reasons he was terminated. But Quan had demanded payment of hundreds of thousands of dollars under the side agreement, which called for payment only if he was terminated without just cause. Quan apparently faults MacKenzie, Hines, and Harper for not asking Quan directly to provide additional information about the reasons for his termination. But as MacKenzie explained at his deposition, MacKenzie did not follow up with Quan because "my experience is, when somebody tells me that they got a lawyer, . . . you don't go back to talk to them." It is unreasonable to expect that the colleagues would simply pay Quan without further investigating from other sources whether they were legally required to do so. Although our review of the record does not reveal testimony on this issue, we question whether any of the colleagues would have asked about Quan's termination *had he not first told them about it* and asked for payment.

In any event, we need not decide whether Quan had a reasonable expectation of privacy since we conclude as a legal matter, as did the trial court, that there was no serious invasion of a privacy interest at issue here. Quan asserts that his cause of action for invasion of privacy rests on the two conversations Holzman had with Harper (in December 2018 and January 2019) when Holzman discussed the reasons Quan was terminated. In the first discussion, which lasted "[m]aybe five, ten minutes, at the most,"

34

Holzman told Harper that Quan was let go because of a reduction in force. During the second discussion, Holman "didn't get into all of the details" of Quan's termination, but he shared that Quan's second meeting at the Santa Rosa office "didn't go well," which was part of why he was let go. When asked at his deposition whether he understood Quan had a right to privacy around the reasons he was let go, Holzman testified that "I was sharing information that Mr. Harper already knew about Mr. Quan's performance in the past. I didn't feel I was sharing anything that he didn't already know." Both Harper and Hines testified that the reasons they were told about Quan's termination were consistent with their years of experience working with him. Given all this, and the fact that the information was not widely disseminated, but used only to determine whether Quan was owed hundreds of thousands of dollars, we do not find that the disclosure was sufficiently serious.

By being the first one to reveal that he was terminated, Quan did not "conduct himself . . . in a manner consistent with an actual expectation of privacy" regarding the reasons for his termination. (*Hill*, *supra*, 7 Cal.4th at p. 26.) Where, as here, there is an element of consent, "a defendant's conduct will rarely be deemed 'highly offensive to a reasonable person' so as to justify tort liability." (*Ibid.*) And we reject Quan's argument that we may not consider the issue of consent since respondents did not raise the issue below. True enough, as a general rule a party may not for the first time on appeal raise a new legal theory that was not tried below. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.) But where we are considering a legal question on undisputed facts (there is no dispute that Quan informed Harper he had been terminated), we may exercise our discretion to consider it. (*In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 510–511.)

Quan faults the trial court for not weighing the impact that Holzman's disclosure had on him.  He relies on *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, which held that "all the circumstances, including the motives or justification of the intruder, are pertinent to the offensiveness element." (*Id.* at p. 236.)  In *Shulman*, a mother and son who were involved in a serious car accident sued for invasion of privacy after video of the accident scene and their journey on a rescue helicopter aired on a television program without their prior knowledge or consent. (*Id.* at pp. 210–212.)  Our Supreme Court concluded there was a triable issue of fact over whether a reasonable person would consider recording the mother's private communication to a nurse, as well the helicopter ride to the hospital, to be highly offensive. (*Id.* at pp. 234, 237.)  The wide dissemination of a patient's conversation with the provider of medical care without the patient's permission involves a privacy interest that is orders of magnitude more serious than what occurred here.  And the invasion in *Shulman* was much more drastic since private details were broadcast on television to strangers. The disclosure here involved no more than four people (the three men who entered into the side agreement with Quan and the attorney they consulted).

Because we conclude as a matter of law that any invasion of a privacy interest here was insufficiently serious to support a cause of action for invasion of privacy, we need not consider Quan's arguments on the other prongs of the cause of action.  Summary adjudication as to this cause of action is affirmed.

### III.
### DISPOSITION

Summary adjudication of Quan's causes of action for race discrimination, age discrimination, failure to prevent discrimination, unjust enrichment, and negligent infliction of emotional distress is reversed.

Summary adjudication of Quan's cause of action for invasion of privacy is affirmed.

The case is remanded to the trial court for further proceedings.

Each side shall bear its costs on appeal.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.




_____

Siggins, J.*




*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Quan v. Acrisure of California, LLC et al.* A166628